# C. M. LITCHFIELD v. STATE.

### No. A-1338.   Opinion Filed September 30, 1912.

#### (126 Pac. 707.)

1.   APPEAL—Discretion of Trial Court—Continuance.   (a)   An application for a. continuance upon the ground of absent witnesses is addressed to the sound discretion of the trial court, and, unless an abuse of this discretion appears upon an examination of the entire record, a judgment of conviction will not be reversed upon appeal.

   (b)   As a general rule, a continuance should not be granted to enable a defendant to obtain cumulative evidence.

   (c)   Although an application for a continuance may appear to be good upon its face, yet if upon the trial the record discloses the fact that the testimony asked for would be cumulative, or that such testimony would probably not influence the action of the jury in finding a verdict, a conviction will not be reversed upon appeal.

2.   EVIDENCE—Weight and Sufficiency—Venue.   If there is no evidence in the record of venue, a conviction will be reversed.

3.   WITNESSES—Impeachment—Character—Competency of Evidence. The truthfulness of a witness cannot be impeached by proof of general bad character for morality, or by proof of specific acts tending to prove a want of morality.

4.   HOMICIDE—Justification—Defense of Another.   (a)   Where the defense is that the defendant killed the deceased for the purpose of preventing the deceased from committing the crime of rape upon the daughter of the defendant, it is improper to instruct the jury that they may consider the previous bad character of such daughter.

   (b)   It matters not what the previous reputation of his daughter may be, a father has the right to defend her against an assault with intent to rape, and he may do this immediately and with the most effective means at his command; and, if he kills her assailant, the law will hold him guiltless, even though it may afterwards turn out that he might have prevented the offense by the use of some other means, provided only that the father acts in good faith, and upon reasonable appearances of imminent danger to his daughter.

5.   SAME—Justification—Revenge.   What is known as the "higher law" is derived from the old Jewish law, and has no place in the jurisprudence of Oklahoma.   No person has a right in this state to take the law in his own hands and avenge a real or fancied wrong by the use of personal violence.   The rights given by our statutes are defensive, and are never aggressive.   They may be exercised for prevention alone, and can never justify

that which is done for vengeance only,. and, if a father, husband, or brother kills a man merely as a matter of revenge for an insult done to his daughter, wife, or sister, he will be guilty of murder or manslaughter, according to the circumstances attending the killing.

6.    SAME—Instructions—Insanity of Accused.   (a)   Where there is any evidence in a case upon which the jury might base a reasonable doubt as to the guilt of a defendant upon the ground of insanity, the court should instruct the jury upon this issue.

(b)   The case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, cited and reaffirmed upon the question of what instructions should be given where the plea of insanity is raised.

(c)   The destruction of the domestic relations or the loss of virtue by a female relative constitute a most prolific source of insanity, and it is for the jury to determine when this issue is presented in each case, upon proper instructions from the court, the good faith of this defense, and as to whether the evidence sustains the issue.

(Syllabus by the Court.)

*Appeal from District Court, Garvin County;*
*R. McMillan, Judge.*

C. M. Litchfield was convicted of manslaughter in the first degree, and brings error.   Reversed and remanded.

The following is a condensed statement of the material testimony in the case:

Dr. E. E. Norvell testified for the state:   That he resided at Wynnewood, Okla., and was a physician.   That on the 19th day of July, 1910, he was called to see the deceased at the sanitarium at Wynnewood.   That he found three wounds in his body—one wound through the abdomen, one in his breast, and another through his elbow.   That the wound through the abdomen was necessarily fatal.   That deceased died next day from the effects of his wound.   That deceased was constantly apprehending death.   That witness informed deceased that, if he had anything to say, he had better say it.   Deceased replied:   "I haven't got anything to say.   It is only a mistake."

Mary Collins testified:   That she resided at Roff, and was the mother of deceased.   That on the morning after the shooting, and before deceased died, she asked deceased:

" 'Will how did this happen?'   He says:   'Well, I was standing out at the lake.   Willie Litchfield was talking very loud,

drinking; that some one shot him; that he looked around—it was. Litch.' 'Well,' I says, 'what did you do?' Threw up his hands, and run toward him, and begged him not to shoot any more. I says, 'What did the girl do?' 'She fell on her knees, and begged him not to shoot me any more, for I wasn't to blame. He was talking to this girl—she was to him—about Dean Blakney; that she was pregnant, and wanted advice and money to get away with it; but she charged Mr. Blakney with it. She had this talk to me.' He turned his head on the bed, and says, 'He stole my life; he stole my life.' "

Witness also testified that the deceased informed her that he was not armed.

Mattie Collins testified: That she resided at Wynnewood, and was the wife of the deceased. That she saw him after he was shot. That about 10 or 12 o'clock that night he was conscious of approaching death. He said to her: "If I ever get over this, I certainly will be a better man; but I can't because I am going to die." Witness heard deceased tell his mother that Litchfield shot him. The state then rested its case.

Willie Davis testified for appellant: That she was a married woman. That she married on the preceding 25th day of December. That her maiden name was Willie Litchfield. That she was sixteen years old on the 12th day of the preceding July. That she was the daughter of appellant. That she was acquainted with the deceased. He was a blacksmith by occupation. That deceased was about 27 years old. That witness had frequently visited the home of deceased, and was acquainted with his wife. That deceased had two children. That appellant kept a restaurant in the town of Wynnewood. That witness and the deceased were lovers at the time of his death. This had been going on for about four months. That deceased frequently took witness riding in his automobile both during the day and at night, and expressed for her the warmest love and devotion, and told her he was going to get rid of his wife, and that he would then marry witness, and that by his attentions and profession of love he gained the affections of witness, and finally induced her to have sexual intercourse with him. That as a result of this sexual intercourse with deceased, witness became pregnant. That, when

witness found she was pregnant, she informed deceased of this fact. That deceased advised her to see a doctor, and recommended that she consult Dr. Bailey. To this witness objected. Deceased then told witness he would see the doctor himself. That on the morning of the homicide witness was downtown with her sister when she saw deceased at the Commercial Hotel, and deceased called her, and said he wanted to see her. Witness then went to her father's cafe and deceased came there. That witness was concerned about her condition. Deceased informed her he would see her that afternoon; that they would go out in his automobile, and, to keep down suspicion, he would take the married sister of witness and her husband along. That deceased asked the brother-in-law of witness and her sister to go driving with them. That, after dinner, the brother-in-law of witness, George Waller, drove the automobile of deceased around to the home of witness. That the witness and her sister, Ella, who was the wife of George Waller, got into the automobile. That, after leaving the home of witness and going several blocks, they found deceased standing on the corner. He got into the automobile, sitting on the front seat with her brother-in-law. In the automobile there was a sack with some tin-top and ice in it. After getting into the automobile, deceased took a bottle of whisky and a six-shooter out of his pockets, and placed them behind him. That, at the request of deceased, witness took a drink of whisky. That at this time witness was perfectly sober. That they drove the automobile out to the lake. They drove the automobile into an open spot where they stopped, and they all got out of the car. Deceased took the sack with the tin-top and ice in it, and they all sat down by a large tree. At this time witness had begun to feel the effects of the whisky she had been drinking, and asked for some water. Deceased requested the brother-in-law and sister of witness to .go and get some water, and they started toward the lake. Deceased then placed his arms around witness, and kissed her, and lifted her off of the ground, and said he loved her, and they both drank beer together. That after they were through drinking the beer deceased proposed intercourse with witness, to which witness did not give a definite

answer. That witness and deceased then scuffled around, and he pushed her back against a tree. That just then appellant came up. That before this deceased had laid his gun about three feet from them on the ground. That she was pushed to the ground and had raised up, and, as she raised up, the deceased pushed her to one side. That just as this was done she saw the smoke from the pistol in her father's hands. That witness at this time was so excited and intoxicated she does not remember hearing the shot of the pistol.

Ella Waller testified for the appellant: That she was a sister of the witness Willie Davis. That she was a married woman, and was the wife of George Waller. Her testimony corroborated that of Willie Davis as to what occurred when she was present.

Dr. H. C. Bailey testified in behalf of appellant: That some days before the killing the deceased came to the office of witness, and said, "Bailey, I think I am in trouble, and I am going to need some help from you." Witness asked deceased what his trouble was, and deceased replied, "You know what the trouble is, and I am going to need some help." That Witness said: "Maybe it is not so bad. Let's wait awhile and let it alone;" and finally put the deceased off in this way.

Andrew Finney testified for appellant that he was a farmer. That on the morning after the homicide, while looking for some hogs, he found a pistol lying on the ground at the place where the homicide had occurred.

Dr. W. E. Settle testified for appellant: That a month or two before the killing he went to deceased, and told him he had better look out; that he was on dangerous ground; that Mr. Litchfield was a dangerous man, and that deceased did not know what he would do some time. Deceased said everything was all right; that Litchfield was one of his best friends, and would trust him anywhere with his girls. Witness then warned the deceased that people were talking about him and the girls; that he had better be careful; that he could not always tell what a man would do under those circumstances. On cross-examination, this witness testified that the reason why he warned de-

ceased was because the general rumor was that the deceased was too intimate with the girls, and pretty nearly everybody thought it.

George Whittaker testified for appellant that about two months before the killing deceased was talking with witness about the daughters of appellant. Witness told deceased that, if he did not mind, he would be getting into trouble; that he was carrying the girls around in his automobile, and he had better quit it.

The assistant county attorney of Garvin county and the sheriff both testified that they examined the place where the homicide occurred, and they saw near the root of a tree heel prints in the ground about one or one and one-half inches deep which appeared to have been made by a lady's high-heeled shoe or slipper, and nearby they found a sack with several bottles of tin-top in it, and on the sack was blood.

R. T. Norman testified for appellant: That on Friday morning before the homicide witness met the deceased, and while talking with him Willie Litchfield came by, and deceased said, "Where was you last night when the whistle blowed?" and she said, "You know very well where I was." They both laughed, and she went on, and witness said to deceased, "Bill, I wouldn't go out with this girl." And deceased replied, "The girl is going wrong, and there will be a killing over it, and I never intend to go out with her again."

Appellant testified in his own behalf: That he was engaged in the restaurant business in the city of Wynnewood. That up to the day of the homicide he and the deceased were the best of friends. That on the morning of the homicide the son of appellant received an injury to his eye. That appellant went home and found that his daughters were not there. That, upon inquiry, appellant learned his daughters had gone off in an automobile with deceased. Appellant then got a horse and buggy and drove out to the lake. He had been informed that the automobile had gone to the lake. That when appellant got near the lake he found the automobile there, but no one was in it. Appellant then jumped out of his buggy, and called

his daughters, but received no response. Appellant then went about 150 yards from the automobile into the brush and briars, and went into a little draw. Appellant then heard a person's voice, but could not see anything. He thought he recognized his daughter's voice. She appeared to be pleading and crying. Appellant then started to run in the direction from which the sound came. He next saw the back of a man's shoulders. He ran up to within a few feet of where the man was. He saw deceased holding his daughter. As he went up, deceased threw the girl away from him, and made a grab for his six-shooter, which was lying on the ground two or three feet from him. Appellant then testified as follows:

"Q. Did you know whether or not he got hold of it? A. Yes, sir. Q. Did he? A. Yes, sir; he got it. Q. Mr. Litchfield, state how close you were to him in your opinion when you fired the first shot? A. I guess I was in four or five feet of him. Q. How many shots did you fire? A. I fired two. Q. Now, after you fired the first shot, did he do anything? A. After I fired the first shot, he raised and the tree was to his left—was to his left—he raised and as he raised—as he came up, why I shot him again, and he fell backward, and come up around the tree on the opposite side to me—over to my right. Q. Then what did he do? A. He said to me—he says, 'You have killed me.' He says, 'I would ask you to do something for me, but you can't,' and he turned and went out in a westward direction, walking fairly well. I was watching him. Q. Do you know what he did with the pistol? A. No, sir; I don't know. He didn't have the pistol when he went off. * * * Q. What was your condition of mind at the time you went out there to the tree and found your daughter? A. If I had any, I don't recollect it. Q. Why do you say that you didn't have any mind? A. Well, sir, it is something that I can't express. I have no way of expressing it at all. Q. Well, state what your feelings were? A. My feelings was—I was just in a state of—I was almost unconscious. I was in as bad a fix as I could be. Q. Why? A. Well, sir, when I saw what I saw and the condition of things was in, why I just —I just lost all presence of mind. I would have done anything."

On cross-examination appellant testified as follows:

"A. I found him trying to have intercourse with my daughter, and by the time I saw the condition of things as it was, why he

was in a position to get hold of arms, and so it all happened about the same time. I come up on Mr. Collins, and he was trying to have sexual intercourse with my girl, with my daughter, and had her backed up against a tree—Q. Did you hear what she was saying? A. I couldn't understand. Q. Did you understand anything she said? A. No, sir; I didn't. Not her words. Q. Did you understand anything he said? A. No, sir; he never said anything to me. He never said anything to me only what he said after he come up around the tree after the shooting. Q. How do you know he was trying to have intercourse with her? A. I could see what he was doing. He was making every effort. He had his arms around her, and had her backed right up against the tree, and he was right in front of her. Q. He didn't have her clothes up, did he? A. He was making an attempt in this way. He had his arm around her, and he was in a stooped position. His head was lower down than hers. I caught the glimpse of his head; and the first time I saw his face it was over her left shoulder. He was stooping down, you see. He seemed to be in a stooped position in front of her."

Clif Cunningham testified in behalf of appellant that witness was acquainted with deceased, and had a conversation with him on the morning of the day of the homicide. Witness then testified as follows:

"Q. Anything further said up there? A. Yes, sir, Q. What was it? A. Well, we were talking about these friends. It came up, and I was pretty well satisfied about who they were, and I asked him and he told me that it was the Litchfield girls, and I told him, I says, 'Bill, if I was you, I would stop that. I wouldn't go any further with that.' I says, 'Litchfield is a man that will kill you if he catches you at such as that.' And he laughed and says, 'Well,' he says, 'when it comes to that—why,' he says, 'Old Betsy makes me equal to any of them.' And he patted himself there, and it looked like the print of a gun there. I don't know what it was."

In rebuttal the state proved by the wife of the deceased that the pistol found at the scene of the homicide was not the property of deceased. It was also proven that the general reputation of Willie Davis, *nee* Litchfield, for truth and immorality, was bad, and many specific instances in which she had acted indiscreetly and in a manner indicating a want of virtue were admitted in evidence, and that she had frequently been seen riding

in an automobile with deceased at night, to all of which appellant objected.

*Carr & Field* and *Blanton & Andrews,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). First. Appellant complains that the action of the trial court in overruling the motion for a continuance was erroneous. It has always been held that a motion for a continuance upon the ground of absent witnesses is addressed to the sound discretion of the trial court; and, unless an abuse of this discretion appears upon an examination of the entire record, a judgment of conviction will not be reversed upon appeal. In this case every fact that appellant desired to prove by the absent witness, George Waller, was proven by other witnesses upon the trial of his case. In the case of *John Bethel v. State, ante,* 126 Pac. 698, decided at this term of the court, Judge Armstrong, speaking for the court, said:

"When a motion for continuance is interposed upon the ground of the absence of material witnesses, and although on its face such motion may contain good grounds for a continuance, if upon the trial the record discloses the fact that the testimony of the witnesses asked for would be cumulative, this court, as a general rule, will not interfere with the order of the trial court overruling such motion."

As the testimony of George Waller for which this continuance was sought was merely cumulative, and as neither the motion for a continuance or the trial disclosed any circumstances or facts which would take the case out of the general rule that a continuance should not be granted to enable the defendant to obtain cumulative testimony, unless it appears from the entire testimony in a case that the testimony for which a continuance was sought was both material and that it would probably have resulted in a different verdict, a conviction should not be set aside because the application for a continuance was not granted. We find there was no error in the action of the trial court in overruling the motion for a continuance.

Second. We do not find in the record any evidence that the lake at which the fatal difficulty occurred was in Garvin county. It is true the evidence shows that the deceased died at Wynne wood, and it is also true that we take judicial notice of the fact that Wynnewood is in Garvin county. The place at which the mortal wound was inflicted was the place which fixed the venue, and it is immaterial as to where the deceased may have died. For a full discussion and citation of authorities on this subject, see *Loyd v. State,* 6 Okla. Cr. 76, 116 Pac. 959. While it is true that it is not necessary to prove venue beyond a reasonable doubt, yet, if there is no evidence in the record of venue, a conviction must be reversed. See *Brunson v. State,* 4 Okla. Cr. 467, 111 Pac. 988.

Third. Appellant complains that incompetent, immaterial, and injurious testimony was improperly admitted against him in the trial court. There are objections in the record to the testimony of a number of witnesses for the state upon this ground. We will present a few specimens of this kind of evidence which was admitted against appellant.

W. J. Courtney testified for the state as follows:

"Q. Do you know Willie Litchfield? A. Yes, sir. Q. Do you know her general reputation for truth or immorality in the neighborhood in which she lived? (To which the defendant objects for the reason that the same is not in proper form of question, which objection is by the court overruled, to which action of the court the defendant excepts, and which exception is by the court allowed.) Q. Answer the question, Mr. Courtney; do you know? A. Well, now, I want to ask a question before I answer that question. Shall that be from what I have heard? Q. Yes, sir. The Court: Answer yes or no. A. Yes, sir. Q. From what people say do you know her general reputation in that community for truth or immorality? Answer the question? A. Yes, sir. Q. Is it good or bad? A. It is bad."

Leonard Yules testified for the state that he was acquainted with Will Collins, the deceased, and Willie Litchfield; that he lived near Wynnewood; that he saw the deceased and Willie Litchfield out in an automobile. He then testified as follows:

"Q. What time of the day or night did you see them? A. Why, it was something like 8 o'clock at night. Q. Now, explain to the jury how you happened to see them? A. Well, they was stuck down there in the automobile, and I went down and watched them pull out. Q. Well, how did you know they was stuck? A. I could tell from the racket they was making down there. Q. What kind of a racket was they making? A. Well, the automobile—you could tell by the way the noise was. Q. When you got down there, did you see Willie Litchfield? A. Yes, sir. Q. I will ask you if when the automobile backed up if anything happened to Willie's dress? A. Yes, sir. Mr. Blanton: Objected to because it is proving specific instances, and is not the proper way to attack a witness, and immaterial as to anything else. (Which objection is by the court overruled, to which action of the court the defendant excepts, and which exception is by the court allowed. Q. Answer the question. A. Yes, sir. Q. What was it? (Same objection. Overruled. Defendant excepts.) A. The tire run over it. Q. Were you on the same side of the automobile that she was? A. Yes, sir. Q Now, what did she say? (Same objection. Overruled. Defendant excepts.) A. She said—I don't know just exactly. She said, 'Damn an old skirt,' something like that."

J. B. Jackson testified in behalf of the state that he was acquainted with Willie Litchfield. He was then asked the following question:

"Q. I will ask you, Mr. Jackson, if you are acquainted with her general reputation in the community in which she lives for truth or immorality? Mr. Carr: Objected to as not the proper form, and not rebuttal. (Objection overruled. Exception by defendant.) Mr. Blanton: We would like for the record to show that we insist the proper question is truth and veracity. Q. Are you acquainted with her general reputation in that community for truth or immorality? The Court: Now, this is one of the sort of questions you must answer by saying yes or no. Now, answer it. Q. That is what people generally say—is the general reputation, Mr. Jackson? A. Yes; I presume so. Q. Is it good or bad? A. Not so good."

Dr. E. E. Norvell testified on behalf of the state that he knew deceased, Will Collins, and had been acquainted with Willie Litchfield for about five years. He was then asked the following questions:

"Q. Dr. Norvell, I will ask you if you are acquainted with her general reputation in the community in which she lives for truth or immorality? A. Yes, sir. Q. Is that reputation good or bad? A. Bad. * * * Q. Did you ever hear anybody say anything about her before this trouble, before this 19th of July? A. Yes, sir; I have heard my wife speak about her. My wife asked me if I knew anything about what kind of girl she was, and that she had heard so and so at the club. Q. What did she say she had heard at the club? A. She said she heard she was riding around in automobiles with married men. Q. What married men? A. Well, Will Collins for one."

No authorities were cited in the brief for the state, neither was any attempt made in oral argument to support the ruling of the court in admitting this evidence. As we understand the law, the rule is that specific acts cannot be proven for the purpose of impeaching the reputation of a witness for truthfulness. If this were permitted, it would result in a confusion of issues before a jury, and in indefinitely prolonging a trial, because each specific act would be made a separate issue, and there would be no limit which could be placed upon the introduction of such issues into a trial. This question has been passed upon by this court favorably to the contention of appellant in the case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, and has been uniformly followed since and has been expressly reaffirmed in the case of *Wallace Porter v. State, ante,* 126 Pac. 699, decided at the present term. That a witness can be impeached by proving his general reputation for morality is a novel proposition to this court. It is true that it is permitted in the courts of Arkansas, but this is on account of a special statute to that effect in that state. As the laws of Arkansas were in force in Indian Territory prior to statehood, we are satisfied that the trial court followed the Arkansas rule which is required by the statute above referred to; but this statute has no force in the courts of Oklahoma. It is a matter of general knowledge and of which this court takes judicial notice that men of the highest reputation for truth are often very lax in their ideas and habits with reference to virtue and morality. This is to be deplored, but it is nevertheless true. We must deal with humanity as it is, and not as we think it should be. It would, therefore, be exceedingly unjust to establish a rule

which would allow many of the most truthful men of the state to have their veracity called in question by proof of their reputation for morality. If this is true as to men, why should not the same rule apply to women? We are not willing to establish a double standard in Oklahoma in favor of men and against womanhood. This court will extend to the prodigal daughter every right and every protection which is afforded the prodigal son. It is a false and vicious standard of morals which opens every door and bids welcome to the prodigal son, but closes every door except that of the grave to the prodigal daughter. We believe that, if any differences are made between men and women, they should be in favor of womanhood. In ninety-nine out of every hundred cases where a girl goes wrong it is owing to the temptation and villainy of some man, and that, too, in the sacred name of love. The record in this case is a fair illustration of this, for the testimony shows that it was by professions of love, promises of marriage, automobile rides, and gifts that the deceased accomplished his purpose with Willie Litchfield, and destroyed her reputation for morality. It would be a parody on law and a libel on justice to condemn her for his protection on account of what he had induced her to do and the bad reputation she had thereby gained. We believe that it would be unauthorized by law and contrary to reason and human experience to hold that the evidence objected to was competent. The objections to all of this testimony should have been sustained by the trial court. It was not only illegal, but it was also highly injurious to appellant.

Fourth. Upon the trial of this cause the court, among other things, instructed the jury as follows:

"You are instructed that there was evidence introduced as to the general reputation of the said Willie Litchfield, but you are instructed that all the evidence offered by the state as to her general reputation for truth and immorality is admitted solely for the purpose of impeaching her and affecting her credibility as a witness, but it is not introduced for the purpose of showing the defendant Litchfield's guilt of the crime charged against him, unless you find that he knew of her reputation and of the immoral acts upon her part."

To this instruction the defendant then and there excepted. That the state had the right to impeach the credibility of the witness Willie Litchfield by evidence that her general reputation in the community in which she resided for truthfulness was bad cannot be disputed, but this could not be done by proof of her general reputation for immorality. The error in admitting this class of evidence was intensified by the instruction given, because in it the jury were expressly told that, if they found that the general reputation of Willie Litchfield in the community in which she resided for immorality was bad and that appellant knew it, they might consider this for the purpose of showing the guilt of appellant of the crime charged against him. Leaving out the question of immorality altogether, the jury should never consider the bad reputation of a witness offered by a defendant for truthfulness as evidence of his guilt. In this case the appellant did not claim that he killed the deceased on account of the previous seduction of his daughter. Neither did he offer evidence of the character of his daughter as a circumstance of mitigation. If this had been done, an entirely different question would be presented, which it would be useless for us to discuss now. Therefore from any standpoint her previous character or conduct was immaterial. One of the defenses was that the deceased was attempting to rape the daughter of appellant; and that, even if appellant was in a frame of mind to make him legally responsible, the killing occurred to prevent the commission of this crime. So the instruction given and excepted to was not applicable to the testimony in the case, and was bad from every standpoint. Even if it were conceded that Willie Litchfield was a girl of bad reputation for morality, this would be no justification to deceased to get her into a drunken condition that he might have sexual intercourse with her. This would constitute rape upon his part; and, if the defendant fired the fatal shot to prevent the commission of this crime, no matter what her reputation may have been, he would be justifiable under our statute. No matter how bad the previous reputation of Willie Litchfield may have been, they were both still human beings, and she was his daughter. If a daughter is too weak to protect herself, upon what ground of

reason, justice, humanity, or law can it be contended that the strong arm of her father may not be interposed in her defense?

As was said by Chief Justice Lumpkin in *Biggs v. State,* 29 Ga. 723, 76 Am. Dec. 630:

"What is the annihilation of houses or chattels by fire and fagot, compared with the destruction of female innocence—robbing woman of that priceless jewel which leaves her a blasted ruin, with the mournful motto inscribed on its portals, 'Thy glory is departed?' Our sacked habitations may be rebuilt; but who shall repair this moral desolation? How many has it sent suddenly with unbearable sorrow, to their graves? In what has society a deeper concern than in the protection of female purity and the marriage relation? The wife cannot surrender herself to another. It is treason against the conjugal rights. Dirty dollars will not compensate for a breach of the nuptial vow. And, if the wife is too weak to save herself, is it not the privilege of the jury to say whether the strong arm of her husband may not interpose to shield and defend her from pollution?"

This statement of the right of the husband to act in defense of his wife applies with equal force to the right of the father to act in defense of his daughter. The father who could witness the debauchery of his daughter and not rush to her assistance would be a base counterfeit upon true manhood's coin. Humanity, reason, justice, and the statutes of Oklahoma all give to him the right and make it his duty to act in her defense immediately and with the most effective means at his command. He is not required to take out pencil and paper and figure as to whether he could prevent the commission of the crime by a resort to some other means than the instant killing of her assailant. All that the law requires is that he should act in good faith and upon reasonable appearances of imminent danger to her, and the law will hold him guiltless, even though it may afterwards turn out that he might have saved her by pursuing some other course. The right of a father to defend his daughter is founded upon the law of nature, and is not and cannot be superseded by any law of society. This is an inalienable right recognized in and protected by the Declaration of Independence. This right is limited to defense against present danger, and does not include vengeance for a past injury. The law does not make men, but

it is made by men and for men.  It would be a gross perversion of power and duty for this court to so construe the law as to judge men by an angelic standard.  It is our duty to make due allowance for the weakness of human nature upon one hand and to respond to its highest hopes and noblest inspirations upon the other.  In this manner only can we aid in securing the administration of justice in its purity in Oklahoma.

Fifth.  Section 2290, Comp. Laws 1909, is as follows:

"Homicide is also justifiable when committed by any person in either of the following cases:  (1) When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is; or (2) when committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or, (3) When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping and preserving the peace."

Under this statute, a father would be justified in killing the man who would attempt to kill his daughter.  How, then, can it be said that the statute does not also give him the right to kill to prevent the rape of his daughter?  Which is worse, to kill the body and let the soul live, or to kill the soul and let the body live?  One is physical pain and death, the other is moral desolation and spiritual assassination.  For a discussion of the enormity of the crime of rape and seduction, see *Hast v. Territory,* 5 Okla. Cr. 181, 114 Pac. 261.

This statute does not go as far as the old law of the Jews went.  The statute justifies a homicide when committed by a private person to prevent the commission of a felony.  The old law of the Jews justified a homicide when committed by a private person as a punishment for a felony already committed.  Under our statute, the state alone punishes for crimes already committed, while under the old law of the Jews the next of kin to the person injured had the right to inflict the punishment.  The case of Shechem, the Hivite, illustrates this rule.  Shechem

defiled Dinah, the daughter of Jacob. When Jacob learned what had been done, he held his peace until his sons, who were then absent, returned home, and, when informed by their father of what had taken place, Simeon and Levi, the brothers of Dinah, slew Shechem, his family and all of his household, and spoiled all that was in his city and house. When Jacob complained that the Canaanites and Perizzites were many and that they would rise up and destroy Jacob and his household, Simeon and Levi replied, "Should he deal with our sister as with an harlot?" For a full account of this entire transaction, see the thirty-fourth chapter of the Book of Genesis. While it is true that Levi after this was called the "man of blood," yet it was ordained by God that all of the priests who were permitted to enter the holy of holies, the sanctum sanctorum of the temple, and there wait upon the altar of the Lord came from the tribe of Levi. What is known as the "higher law" in cases of this kind grew out of the old law of the Jews, but the conditions to which the ancient laws of the Jews were applicable have long since passed away, and neither these laws nor what is known as the "higher law" are applicable to or would be justified by the conditions which exist among us to-day, because we have orderly proceedings in courts of justice for the punishment by the state of all crimes committed. There is, therefore, neither legal excuse nor justification for any person attempting to take the law into his own hands, and inflict punishment for and thereby avenge the commission of any crime, it matters not how serious it may be. While every person has the lawful right to defend against what appears to him, judging from his standpoint, to be imminent danger to himself or to any member of his family of the commission of a felony upon or to do some great bodily injury to such person, even to the extent of taking the life of the aggressor, yet, if the commission of such felony or great bodily injury is complete, no man has the right under our law to kill or in any manner injure the person who did such wrong. In other words, the rights given by our statutes and which may be exercised by private persons are always defensive and are never aggres-

sive. They may be exercised for prevention alone and never can justify that which is done for vengeance only.

In every case of this sort these distinctions should be clearly drawn in the instructions to the jury. In this case the jury should have been informed that if the appellant acted in good faith and upon reasonable ground, viewed from his standpoint, to apprehend that there was imminent danger that a felony was about to be committed upon his daughter by the deceased, and appellant fired the fatal shot to prevent the commission of such offense, then the appellant would be justified in doing so, and the jury should acquit him if they so found or entertained a reasonable doubt on this subject. This instruction should not have been hampered or limited in any manner, except that the converse of the proposition should have been submitted to the jury, namely, that if they found from the evidence beyond a reasonable doubt that appellant, viewing the circumstances of the case from his standpoint, did not have reasonable ground to apprehend that there was imminent danger of such offense being committed upon his daughter when he fired the fatal shot, and did not then in good faith so believe, then and in that event they should find him guilty of murder or manslaughter as defined in other portions of the instructions, and of that offense of which they had no reasonable doubt. This was the pivotal point in the case, and the instructions should have been so clear as not to need explanation and as to be readily within the comprehension of men who are not educated in the law, such as jurors ordinarily are.

Sixth. In this case an instruction was requested by appellant upon the subject of insanity. The instruction as requested by appellant was properly refused by the court because it was not a correct statement of the law. But, the matter having been called to the attention of the court, it should have given the jury a proper instruction on this subject, if, in the opinion of the court, it was applicable to the testimony in the case. See *Morris v. Territory*, 1 Okla. Cr. 617, 99 Pac. 760, 101 Pac. 111. As to what would be a correct instruction upon the subject of insanity, it matters not what may have been its cause, see *Adair v. State,*

6 Okla. Cr. 284, 118 Pac. 416. In this opinion Judge Doyle care-
fully considered our statutes on this subject, and we think that
the conclusions reached and stated are absolutely fortified by
the authorities, and are supported with unanswerable logic. This
opinion does not grow out of an immature impulse, but it is the
result of the lifetime investigations and reflections of all of the
members of this court. It may therefore be accepted as a prec-
edent to be followed in the future in the matter of preparing
instructions upon the subject of insanity. So the only question
is as to whether or not the testimony in the record is such as to
present this issue. While the testimony upon this question is
by no means strong, yet we cannot say that it might not be the
basis in the minds of the jurors of a reasonable doubt as to the
sanity of appellant, and we can well see how upon a second trial
counsel for appellant may strengthen their case in this respect.
Insanity is one of the most mysterious diseases to which human
beings are subject. It has its origin from a thousand different
causes. Sometimes it results from intense religious excitement.
At other times it grows out of sickness or a personal injury. It
may be hereditary, and often cannot be explained. The records
in such cases show that grief, sorrow, or shame resulting from
the disruption of domestic relations or loss of virtue by a female
relative constitute a most prolific source of insanity. We cannot
imagine a more grievous affliction that can befall a father than
to witness an attempt to debauch his daughter. What could be
more highly calculated to cause the trees and stones to call to
him, "Shame! shame! shame!" and to light the fires of hell in
his heart, and make them blaze in his veins and cause his reason
to reel and stagger on its throne? To every true father his
daughter is the core of his heart, the pride, the joy, and the
inspiration of his life. He would willingly die a thousand deaths
to save her from shame. Her dishonor poisons all of the sources
of his happiness, and renders life a burden, a nightmare, a curse,
and a disgrace. Nothing is more sacred than the virtue of our
girls. It is above everything else on earth. Human life cannot
be compared in value to it. Destroy this, and a greater injury
will be inflicted upon society than would result from the com-

bined effects of war, pestilence, and famine. The records shows that unbearable grief and shame caused by the destruction of the virtue of a female member of a family has driven many a father, husband, and brother into insanity and the grave. This is not a branch of the "higher law." Voluntary intoxication is neither a defense nor a mitigation for the commission of crime, but an act by one who is suffering from delirium tremens which is a result of intoxication is not punishable by law. Why? Because delirium tremens is involuntary, and is recognized by all authorities as a species of insanity. If a man kills another as a matter of revenge or anger on account of some insult or injury done to a female relative, such killing will not be justifiable or excusable, but will be either murder or manslaughter, according to the circumstances under which it was committed. But, if a man kills another while insane, the killing is excusable, although the insanity may have been the result of grief, shame, or shock caused by an insult or injury to a female relative of the party doing the killing. In other words, it matters not what the cause of the insanity may be. If such insanity exists, it is a complete defense to the commission of crime. The issue of insanity when applicable to the evidence should be submitted to the jury, and they alone should be the judges as to the good faith of this defense. Every defense is liable to be abused, but this is no reason why any legal defense should not be submitted to a jury.

For the errors hereinbefore pointed out, the judgment of the lower court is reversed, and the cause remanded for proceedings in harmony with this opinion.

ARMSTRONG and DOYLE, JJ., concur.