BILL NUTT v. STATE.

No. A-1056.   Opinion Filed November 18, 1912.

(128 Pac. 165.)

1.   HOMICIDE—Evidence.   In a prosecution for murder, the evidence is held to support the verdict, and that no reversible error was committed on the trial.

2.   HOMICIDE—Self-Defense—"Justifiable Homicide."   To constitute the defense of "justification" where a homicide has been committed, the apprehension of danger must be founded on sufficient circumstances, real or apparent, to authorize the opinion that the felonious design then existed.

3.   TRIAL—Instructions.   Where the instructions of the court considered as a whole fully and fairly present the law of the case and are not inconsistent, they are without error.

(Syllabus by the Court.)

*Appeal from District Court, Pontotoc County;*
*Robt. M. Rainey, Judge.*

Bill Nutt was convicted of murder, and appeals.   Affirmed.

*Galbraith & McKeown, J. B. Champion,* and *Crawford & Bolen,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J.   The plaintiff in error was charged, by information filed in the district court of Pontotoc county on August 14, 1909, with the crime of murder, committed July 20, 1909, upon the body of T. F. Morrow.   Having entered a plea of not guilty, his trial resulted in a verdict of the jury finding him guilty of murder and assessing his punishment at imprisonment in the penitentiary for life at hard labor.   On September 29, 1910, a motion for a new trial was overruled, and judgment and sentence was pronounced and entered in accordance with the verdict.   From this judgment the defendant prosecuted an appeal by filing in this court on March 27, 1911, his petition in error with case-made.

T. F. Morrow, the deceased, was foreman for a sewer construction company in the city of Ada, coming to work there a few weeks before his death, and during that time he was stopping at the Byrd Hotel. On July 20th, about 7 o'clock, while he was standing in front of the counter in the hotel office, talking to the defendant's wife, she being behind the counter, the defendant approached and shot him three times with a large caliber pistol, killing him almost instantly. The principal eyewitnesses of the assault were Mrs. Sue Rains, L. E. Rains, and Charles Goodwin.

Mrs. Sue Rains testified that she lived in Ada on July 20, 1909; that she had known Mr. T. F. Morrow for about three or four days before he was killed; that for that length of time she and her husband had been running the Byrd Hotel; that at the time the killing took place she was sitting in the dining room at the table; that she was not eating; that the building faced the east; that there are two sets of double windows on the front of the building; that right by one of these windows was a typewriter; that just a minute or two previous to the killing she saw Mrs. Nutt, wife of the defendant, sitting at the typewriter; that she saw Mr. Morrow come up to where she was, and she turned around and faced him and flicked a piece of paper or something in his face, and he brushed it back in her face, and they then stepped out of sight; that they seemed to be in a good humor; were laughing; that there were double doors between the dining room and the office; that she could see through these rooms into the parlor and could see part of the office; that she never saw Mr. Nutt until the shooting; that the shooting took place about four or five minutes after she saw them standing at the typewriter; that Nutt had a pistol in his hand when she saw him; that she did not see Mr. Morrow until after the first shot was fired; that when Nutt shot again Morrow's arms were hanging by his side; that her son, who was sitting at the dining table, got up and went towards the door and told him not to come in there, and Morrow then turned towards the parlor door. "I believe the third shot was fired before my son told him not to come into the dining room. I did not see Mr. Morrow except when the second shot was fired."

Charles Goodwin testified: That he lived at Stratford. Did not know Mr. Morrow. Knew Bill Nutt when he saw him. Was at the hotel on the evening of July 19th. Stayed there the night before the killing. Had been back to the hotel probably an hour before the killing took place and was sitting on the porch in front of the hotel facing the lobby of the hotel. Morrow was out there talking just a short time before the killing. Saw Mrs. Nutt there. She was standing in the northeast door. She stayed there two or three minutes—

"There was another lady, I think Miss Burns, that was discussing some statement with her about giving away something; I think it was the Grand Leader. Morrow was in conversation with her, and asked her, 'What is that you are giving away this evening?' and she says, 'You think you are awfully darn smart.' She turned and walked back into the lobby and went over to the typewriter right at the window. Morrow stayed in his seat beside me for a few minutes, and then he got up and asked me to go to town with him. He was in his shirt sleeves and got up and went into the building in the southeast door, and got his coat and came back to the counter, and Mrs. Nutt was behind the counter. Before that, while she was sitting at the typewriter, Morrow had said to her, 'You had better look out, you will be walking on that thing directly,' and she said, 'What is that to you,' or something like that. Mrs. Nutt was behind the counter when the shooting took place; Morrow was on the outside of the counter. The counter was between them. The defendant appeared at the door that leads into the lobby. He was at the door when I first saw him. He said 'damn' something, and the report of the gun drowned the rest of the sentence. Morrow was standing right there with his arms against the counter. It was all done in a flash. He had his right side to the man shooting and held his arms in a crouching position and walked slowly away from him with his right side towards the defendant. During this time, the defendant was shooting him; moving on to him; held his gun out, walking right towards him. There was a greater interval between the first and second shots than between the second and third. The first shot was fired by Nutt while he was standing in the door. After he fired that he came right on, following the way the man moved. Morrow was standing just about to go into the dining door when the last shot was fired, and Nutt was within three feet of him."

L. E. Rains testified: That he had been running the Byrd Hotel two or three days at the time of this killing. That he was eating his supper in the dining room, and the shooting attracted his attention. He heard three shots fired. He jumped up, looked around, and saw the defendant coming towards Mr. Morrow, who was going in a kind of stooping position with his hands down to his side with nothing in them towards the dining room door, and "I told him not to come through the door. The defendant had his gun up, and as Mr. Morrow turned he fell against the side of the wall, and the defendant, who was then within five feet of him, fired the third shot. Mr. Morrow staggered and fell and died almost instantly."

Dr. T. W. Hartman testified: That he was called to the Byrd Hotel on the 20th day of July, 1909, and found the man Morrow dead. Made an examination of his body. That he had three bullet wounds, all of them entering on the right side. The first one was 2½ inches below the point of the shoulder, and the second one 5½ inches below, passed through the arm and entered the thoracic cavity and was lost in the lungs. The next one entered 9½ inches below the point of the shoulder and passed through the arm and went through the body on a level and came out about 5 inches posterior to the left nipple. It was the only bullet to penetrate the entire body. Two of these wounds were necessarily fatal, the lower two.

Harry Parks testified that the width of the counter at the Byrd Hotel was 30 inches, height about 4 feet, with six feet space between the counter and the wall behind it.

On behalf of the defendant, W. H. Brinlee testified that he heard Mr. Morrow and somebody else talking while Mr. Nutt and his wife were passing, and Mr. Morrow remarked that this fellow Nutt had the name of being a pretty bad man, but "I am going to accomplish my desire with that Indian woman if I have to kill him." That this was three or four days prior to the killing, and that he told the defendant what Morrow had said about the middle of the afternoon before he killed him that night. On cross-examination the witness testified that he had sold a good

deal of whisky during the Indian Territory days, and was convicted for selling since statehood.

W. R. Royal testified: That he heard a conversation between Mr. Morrow and another gentleman, and the other gentleman said to Mr. Morrow: "You had better let that woman alone. They tell me that Bill Nutt will shoot a fellow." And Mr. Morrow said: "That fellow ain't nothing but a big wind. If he was to draw a gun on me, I would take it away from him and wear it out on his head." That this was two or three days before the killing.

Luke Jenkins testified that he was in the Byrd Hotel one night and Mr. Morrow tried to break into Mrs. Nutt's room; that he told him that Bill would shoot him; and that he said that he could shoot some himself. Cross-examination showed that witness was running a joint; had been convicted of a violation of the quarantine law, .and that he was up in the hotel to see a woman that night.

J. D. Morris testified that he heard Mr. Morrow say:

"'I never did have intercourse with a damn Indian. Don't guess he knew I was Indian. He said: 'I've got one on the string.' I said, 'Who is it?' He said, 'A woman around here at the Byrd Hotel.' He said, 'It's Bill Nutt's wife.'"

Bone Hardin testified that he was acquainted with the deceased—

"Rode with him the day of the killing. He was in the hack with me and said that he was going up there and f—— old lady Nutt, and I told him that Bill Nutt would kill him, and I went and told Bill."

Mrs. Nutt testified: That she was the wife of the defendant. That she had been staying at the Byrd Hotel about two weeks prior to the killing. That when Mr. Morrow had been there three or four days he asked her why she did not keep her room open at night—

"He said: 'Why don't you leave your room door open? You are not like most women at hotels.' I said I wasn't in the habit of leaving my door open at night. I got up one morning and walked around that porch, and he was inside his room there, and he come up and said, 'Who are you looking for?' and I said, 'Nobody, particular,' and he said, 'I guess you are looking for that thing that wears the umbrella hat.' Had refer-

ence to my husband. He said. 'Come inside here,' and I said, 'I won't do it,' and I turned around and went down. Another time he said, 'Follow me upstairs.' One night somebody tried to get in my room, knocked on the door and then kicked on the door, and I heard Luke Jenkins speak outside to some one. I told whoever it was to get away from my door. The evening before the killing I was upstairs going to my room, and he jerked me into his room and onto the bed, and I told him if he did not let me go I would call Mr. Parks, and he told me not to holloa for Mr. Parks. He had his hand on my neck. I got up and went down the back stairs to where Bill was in the barn. I was crying. I told Bill I could not stay up there, and he told me to go back up to the hotel and stay there with Nannie. I tried to get a room elsewhere. On the night of the killing I ate at the Byrd with Nannie Burns. Saw deceased in dining room. I was talking to Nannie about one of the hands on our place, and said, 'He is always wanting something,' and Nannie said, 'I guess you gave it to him,' and Mr. Morrow said, 'If you got anything to give away to-day, I will take it.' He came around and put his arms around me that way, and says: 'Got anything to give away? If you have, I will take it.' I jumped up from the table and walked on out into the lobby and told Nannie, 'Let's go.' He walked out on the sidewalk. He sat there a minute, and I got up and got an envelope and sat down at the typewriter, and Mr. Morrow came up and said: 'You better let that thing alone. You will be walking on it directly.' And I said, 'None of your business if I do.' Just before that we were standing in the door, and Nannie said, 'I will go and see if Lewis has come,' and Mr. Morrow holloaed and said, 'Giving anything away to-night?' and I said, 'You think you are awful darn smart,' and that is when I went to the typewriter. He come and grabbed that paper out of my hand and hit me in the face with it, and I turned and walked over to the desk, and he walked right up by me, right beside me, and he says to me, 'Are you going with me?' and I said: 'No, Mr. Morrow; I am not going with you. Don't you know you are going to get into trouble. I am another man's wife.' He said: 'I don't want to hear that. That is not what I want to talk about at all.' I was just telling him about the way he was doing and begged him not to do me no such way, and he said that he did not want to hear about it. I told him I would tell Bill, and he said he was not afraid of him. While he was standing there, he put his arms around me that way. We were both leaning over the counter, and he just throwed his arm around my neck, and as he threw his arm around my neck I looked up and seen Bill, and I said, 'There's Bill now,' and he just dropped his arm down that

way and reached back this way, and Bill commenced shooting. Bill was standing in that door that leads upstairs. He shot three times. The shots were fired just as quick as they could be."

Mrs. Nutt further testified that a day or two before she went to live at the hotel her husband, the defendant, did not run her down the street with a six-shooter and abuse her and accuse her of having been too intimate with other men.

The defendant testified on his own behalf: That he was in the livery business at Ada. Was not acquainted with T. F. Morrow, the deceased, but had seen him around the hotel several times—and quoting from the transcript:

"My wife first told me about him making advances towards her two or three days before the killing. She told me that we would have to get another place; that fellow kept after her all the time. I told her that: 'If necessary we could go then, but maybe you are mistaken. Beat the thing off the best you can, and we will try to make other arrangements.' The evening before the killing she came to the barn, and said, 'That man is fooling with me again.' And I said, 'Don't tell me that,' and she said, 'Well, I don't want to get in trouble, if we can avoid it.' She said he had jerked her into his room that evening, and I said: 'That is all right; if you don't want to go back, you can stay here.' She went on back to the hotel. After a while, I went down to Luke Jenkins' joint, and he asked me for his gun, and I told him it was up at my room and offered him mine, and he said he did not want it. After that I went up to the hotel to see my wife. This man Morrow and my wife were standing at the desk, and as I walked in she threw his arm off her neck like that, his left arm, just as the door slammed. She said, 'There is Bill,' and when she said that he threw his hand back just like that, and I shot him as fast as I could. When I saw that, I just went to pieces. I did not move out of my tracks. Afterwards, I surrendered to the officers."

On cross-examination witness testified as follows:

"Q. Bill, what did you kill that man for? A. I killed him to protect my family, exactly what I did. Q. That is what you did it for? A. That's it. Q. Is that all you killed him for? A. Exactly what I done. To protect my family. Q. Then you didn't kill him because he put his hand behind him? A. I thought he would kill me if I did not kill him, and he was with my family."

On behalf of the state, in rebuttal, Walter Goyne testified:

"When I heard the shooting I ran to the hotel and met the defendant and said to him, 'Bill, what is this trouble about?' and he said: 'Well, I will tell you. I went in there in the hotel, and there was a man had his arms around my wife, and I killed the son of a bitch'—or something like that."

R. M. Roddie testified that he lived in Ada and never saw T. F. Morrow except the night he was killed; that he was at the Byrd Hotel five or ten minutes after and had a conversation with Mrs. Nutt immediately after arriving there, in substance as follows:

"I said, 'Mrs. Nutt, how did this happen?' and she replied: 'Mr. Morrow came in to get his coat, and said, "You all going to the show to-night?" And as I started to reply Bill came in that door and drawed his gun, and said, "What in the hell are you all doing there?" and begun to shoot, and I begged him not to.' I asked her what Bill shot him for, and she replied, 'Nothing at all.' She said Mr. Morrow had not mistreated her."

Mrs. L. E. Rains testified: That she heard Mrs. Nutt say after the shooting that Nutt killed Morrow on account of jealousy; that Nutt thought that Morrow had his arm around her and he did not; that he was reaching for a match. That she never noticed any improper conduct on the part of Morrow towards Mrs. Nutt. That Mr. Morrow never came around but what she was there and was always butting in and saying something to embarrass him. "Sunday evening was the first time I met Mr. Morrow, and we were talking in the hotel lobby. Mrs. Nutt came up and sat down, and Mr. Morrow said something about it being very warm, and she said, 'I guess you drink too much whisky,' and it seemed to embarrass him very much."

Lizzie Ellington testified that her room had been next door to Mrs. Nutt's, and she overheard a conversation between Bill Nutt and his wife in which he told her that she should not treat Morrow or Fitzgerald that way; she said she would about do as she pleased, and he said he would put them out of the way, or something of the kind, and she then told him he was not game enough. She further testified that either the morning of the killing, or a morning or two before that, Mrs. Nutt called Mr. Morrow into her room; that she waited table for supper that night and waited on Mr. Morrow and saw him when he left the dining

room; that she did not see him go by the table where Mrs. Nutt was eating and put his arms around her.

Harry Parks testified that while he was running the Byrd Hotel, in July, Mrs. Nutt came there and asked him about a room for three or four days, telling him that she and Bill had separated, and that he suggested to her that she go to some private house, and she said that she was afraid of Bill and wanted to be around where people were in the daytime. "Bill Nutt did not board there. I ran the hotel up to within three days of the killing."

Mrs. Harry Parks testified: That she and her husband had been running the Byrd Hotel prior to July 16, that she was acquainted with Morrow and Fitzgerald, that Mrs. Nutt would invariably stop these men and talk to them.—

"It was quite frequently; I had to notice it. They did not force conversation on her and never did act ungentlemanly towards her. It was the conduct of Mrs. Nutt that attracted her attention. Nutt was not boarding there. Three days before Mrs. Nutt came to the hotel I saw Bill Nutt running her down the street with a six-shooter."

W. H. Nettles testified that the next day after Mr. Morrow was killed he took a statement from Mrs. Nutt as follows:

"When I first saw Mr. Nutt at the shooting he was standing in the cut-off just in front of the stairway of the office. He was just standing there, and I didn't see any six-shooter. I guess he stood there a couple of minutes. He spoke to Morrow, and said: What are you people doing there? What are you talking to my wife for?' And as soon as he said this he shot."

Mrs. Sue Rains testified that Mrs. Nutt seemed to push herself around on Mr. Morrow so much as to be taken notice of. "I had heard these little things, and of course I noticed it. She always seemed to love to be around him."

The petition assigns 35 specifications of error, only five of which are presented in the brief. It is the duty of this court to consider all assignments of error properly made and presented; but it is a well-established rule that assignments of error not argued orally or presented in the brief are to be considered as abandoned.

The assignments of error relied upon for a reversal of the judgment as presented in the brief relate solely to instructions given and instructions requested and refused. It appears that there was some evidence which in the opinion of the trial court made it necessary to instruct the jury upon the law of self-defense. The defendant's counsel in their brief say: "Self-defense being in reality the only defense, even staggered at under the evidence;" and contend that the court erred in two of the instructions given bearing upon this question. These two assignments can well be disposed of by saying that there was no evidence tending to establish a case of justifiable homicide in self-defense. It is true that the defendant's wife did testify that, when she said, "There is Bill now," the deceased "dropped his arm down and reached back," and the defendant on his own behalf testified that when she said that the deceased "threw his hand back." It is also true that the defendant testified that "I killed him to protect my family, exactly what I did."

Under the undisputed evidence, and under the defendant's own admissions, there was no real or apparent necessity for taking the life of Morrow in order to save his own life or prevent great bodily injury.

Counsel cite the cases of *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447, and *Floyd v. State,* 5 Okla. Cr. 65, 113 Pac. 212. In these cases instructions were held to be erroneous because they were held to destroy the right of the defendant to act upon the appearance of danger. The instructions given in this case do not destroy that right, because the court clearly instructed the jury if the defendant did believe "that he was in danger of losing his life or of receiving great bodily harm he would be justifiable." This certainly gave the defendant the benefit of the danger as it appeared to him at the time, and it was entirely different from the instructions as given in the two cases above referred to and relied upon for a reversal of this judgment.

The court further instructed the jury on the right of the accused to defend his wife as follows:

"Homicide is also justifiable when committed in the lawful defense of such person, or of his or her husband, wife, parent,

child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished."

And further instructed as follows:

"The defendant pleads that he shot and killed the deceased in the lawful defense of his wife, and in this connection you are instructed that he would be justifiable in so doing, if there was reasonable grounds to apprehend a design to commit a felony or to do her some great personal injury, and imminent danger of such design being accomplished. But before he would be justified, it must appear that the killing was necessary to prevent the immediate commission of such felony, or that the killing was absolutely necessary to prevent great bodily injury being immediately inflicted on the wife of the defendant; that is, as it reasonably appeared to defendant at the time viewed from his standpoint. Homicide in defense of the chastity of the wife to be justifiable must be to prevent an impending violation thereof, and reasonably necessary to prevent, and not a past offense or a future attempt. If you find that the defendant shot and killed the deceased, T. F. Morrow, in his necessary self-defense, or in the lawful defense of his wife as above defined to you, you will acquit him."

This is the defense sought to be made out by the evidence, and no complaint is made of these instructions. They correctly and fully state the law upon that subject. The defendant had the benefit of both defenses in this case, and with all that the jury found that the homicide was neither in his own necessary self-defense nor in defense of his wife.

The charge of the court, considered as a whole, was sufficiently favorable to the defendant, and there was no error in refusing the instructions requested. This court has repeatedly held that instructions are to be considered as a whole, and, when so considered, if they fully and fairly present the law of the case to the jury and are not inconsistent, they are without error.

It seems from the evidence that the murder of Morrow was prompted by a spirit of wanton jealous rage induced by seeing him talking with the defendant's wife, and that it was a cruel, cold-blooded, and deliberate murder. The verdict of guilty was unquestionably right.

We have examined the other assignments and failed to find they, or any of them, are well taken, and we have found nothing in the record demanding a reversal of the judgmnt of conviction.

Wherefore the judgment of the district court of Pontotoc county is in all things affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.