## J. J. NEECE v. STATE.

No. A-9643. July 11, 1940.
(104 P. 2d 568.)

W. J. Peterson, E. M. Carter, and Joe S. Eaton, all of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and L. A. Wallace, Co. Atty., of Okmulgee, for the State.

BAREFOOT, J. The defendant, J. J. Neece, was charged in the district court of Okmulgee county with the crime of murder; was tried, convicted of manslaughter in the first degree, and his punishment assessed by the jury at six years in the penitentiary, and he has appealed.

This case arises from the killing of the deceased, Woodrow Roberts, by the defendant, J. J Neece, upon the street or highway of the city of Henryetta, Okmulgee county, on the 15th day of October, 1938. Deceased was shot by defendant and died in the hospital at Henryetta on the 15th day of October, 1938.

In his petition in error defendant states 13 grounds for which he asks a reversal of the case. In the brief filed only four of the errors are presented, and those only raise one question. That the verdict is not sustained by sufficient evidence, is contrary to law, and the court erred in overruling defendant's demurrer to the evidence, and in refusing to instruct the jury to return a verdict of not guilty.

The record reveals that the defendant at the time of his trial was 57 years of age. His wife, Gladys Neece, was 27 years of age. They had been married in Lamar, Mo., eight years before. They had moved to Henryetta, and had lived there since that time. About five years prior to the killing, the wife of the defendant had been a Pentacostal preacher, and had at different times conducted revival services. Three of these services were conducted at or near Quinton, in Pittsburg county. The first of these serv-

ices was in June or July, 1938, and the last in August, 1938. At the first of these services she met the deceased, Woodrow Roberts, but this was only a casual meeting. The defendant was present at this meeting, but did not go with her when the meeting in August, 1938, was started. She was accompanied by a daughter whom they had adopted, named Helen Neece, and Pauline Johnson, a niece of the deceased, who had come to live with defendant and his wife. They assisted in the revival. The evidence further revealed that deceased came to the room of Mrs. Neece after the services each night, and visited with her and his niece, and the adopted daughter. On one occasion the defendant came to Quinton and found the deceased and his wife and and his niece, Pauline Johnson, all lying on the bed late at night, and deceased got up and left, but it was denied that any improper relations were ever had between deceased and defendant's wife. However, the evidence shows that the deceased and defendant's wife were very much in love with each other, and this is admitted by her while testifying in this case, and by a letter introduced in evidence, and written by her to deceased just four days prior to the killing. The evidence reveals that she told defendant she was in love with deceased, and did not love him. The deceased asked her to secure a divorce from defendant so he could come to see her, and not be molested by defendant. She agreed to this, and talked it over with defendant, and he finally agreed that they would divide their property and he would sign a waiver and let her procure a divorce. The divorce petition was filed on September 8, 1938, and the divorce was granted on the 30th day of September, 1938. After this divorce was granted defendant and his wife resided at the same home, but occupied different rooms, and did not live as man and wife. Deceased from time to time came to see her, and she would meet him at different

places. There were constant disturbances and talk, and some threats but no actual combats, until deceased came from Quinton to Henryetta on Saturday the 15th day of October, 1938. Two of his friends had accompanied him to see the niece of deceased, Pauline Johnson, and Helen Neece, the adopted daughter. The defendant objected to this by reason of the age of the girls. The deceased on arriving at Henryetta wrote a note to Mrs. Neece, and asked her to meet him at a point on the railroad tracks, near her home. This she did about noon, and then returned to her home and after the noon meal she again met the deceased and they were together from about 1:30 to 5:30. They were seen together by defendant, who was nervous and somewhat excited. He had been to his home two or three times and had forgotten what he had gone for. About 3:30 he went to his home and got a screwdriver for the purpose of fixing a sewing machine for another party. This was his business. He also upon this occasion placed in his pocket a .32 pistol. He left home, and, as he testified, was going to the home of his sister, where he intended to stay all night. The deceased and Mrs. Neece had separated, and defendant in passing the streets came abruptly face to face with deceased, and it was at this time that the killing occurred.

The state introduced four eyewitnesses to the killing. They were C. E. Attiberry, Charley Hart, F. F. Whitaker, and Floyd Baxter. Each of these four witnesses saw the firing of the four shots. There were minor differences in the way each one saw it, but their evidence was substantially the same. Mr. Attiberry was about a half block distance from the scene of the difficulty. He saw both defendant and deceased standing up about two paces or six feet apart. The firing of the gun first attracted his attention. After the first shot was fired the two men went together, and

fell to the ground and two more shots were fired. He was unable to state their exact position at the time the last two shots were fired.

The witness Charley Hart was a high school boy 17 years of age. He lived near the scene of the difficulty, and was standing on his porch. When he first saw the defendant and deceased, "deceased was stooped over with his back toward Mr. Neece." Two shots had been fired. And while Mr. Roberts had his back toward defendant the third shot was fired. They were about two feet apart. He went to the scene of the difficulty immediately afterwards.

The witnesses F. F. Whitaker and Floyd Baxter lived in Okmulgee, but were in an automobile coming from Henryetta to Okmulgee at the time of the difficulty. They witnessed the shooting from the car in which they were riding.

Mr. Whitaker testified as follows:

"Q. Now, when you first saw them, just tell what was their positions with reference to each other? A. Well, I was passing by in a car and I wasn't quite even with them, going slow behind a truck, and I was trying to make the corner and had practically stopped, and the first thing I saw that attracted my attention was Roberts fall and he fell forward on his hands. Q. Now do you know what caused him to fall? A. I do not. Q. Which way did he fall? A. Well, you mean which direction? Q. Yes, sir. A. North and east I would say. Q. Did he fall toward the defendant or from the defendant? A. He fell from him. Q. Then what happened? A. Well, he jumped right back up. He never did fall clear down. He fell forward on his hands and he jumped back up and started to, I guess, started to grapple—Mr. Eaton: Object to that. The Court: Sustained. A. He started toward Mr. Neece and Mr. Neece stepped back one or two steps and reached in here and grabbed a gun and started shooting. Q. And how far apart were they when the first shot was fired? A.

About three feet. Q. And then how far apart were they when the second shot was fired? A. About the same distance. Q. And the third? A. The same distance. Q. What was the relative position of each of the parties to each other when the third shot was fired, were they facing or —Mr. Eaton: Never mind; he knows what relative means. A. I don't believe I understood. You mean the position they were in when the third shot was fired? Q. Yes. A. When the third shot was fired, Roberts was on the ground. Let me get this straight. He fell after the third shot. He wasn't on the ground when he shot him. Q. Well, you still haven't answered my question about the relative position of the parties to each other when the third shot was fired? A. Neece was standing east of him when the third shot was fired. Q. Do you know which way Roberts was facing when the third shot was fired? A. I don't know. Q. Do you know where Roberts was shot? Do you remember or did you observe? A. Do I know where he was shot? Q. Yes, sir. A. Yes, sir. Q. Now what part of his body—Mr. Eaton: Object to that unless he saw it. A. I picked him up; I saw it. Q. All right. A. He was shot right here (indicating). Q. Turn around and let the jury see. A. He was shot right below the arm pit in the back. Q. Can you explain to the jury how he was shot back there; how he managed to shoot him in the back? Mr. Eaton: Now we object to that; that is for the jury to say. The Court: Overruled. Mr. Eaton: Exception. A. Well, when the shooting started, Roberts was coming in to him when the first shot was fired and about the second time, the time the second shot was fired, he had spun around like he was trying to get away and when the third shot was fired—Neece wasn't standing still himself; they were both moving around pretty fast—and when the third shot was fired it looked to me like Roberts had his back to him; he was sideways to him; he didn't have his back to him; but he was sideways."

The evidence of the witness Baxter was substantially the same as that of the witness Whitaker. He testified they were about two feet apart, and that the deceased, Roberts, had his back or side towards the defendant when the last two shots were fired.

The evidence revealed the deceased was in his shirt sleeves at the time of the difficulty; was not wearing a hat, and was not armed in any way. That defendant had on his coat, and was wearing a hat, and had a .32 pistol. Immediately after the shooting the defendant left the scene of the difficulty, but was arrested by two officers in some weeds immediately thereafter. He had the gun in his pocket, and it had been fired three times.

The defendant placed upon the witness stand one eyewitness besides himself. This was J. B. Calhoun. He had been subpoenaed by the state, but was not used by them. He lived within a half block of the scene of the difficulty and witnessed it from near his home. He had been to the ice dock and was returning home. He first saw them standing facing each other. He looked back and they were in a tussle and fell to the ground, and deceased was on top. He said, "About the time they hit the ground there was a shot fired and they scuffled for only a second or two and there was another shot fired and the deceased kind of raised up and Neece started to get up from under him when the third shot was fired." This witness was the first one to the deceased after the difficulty. He saw the witness Attiberry there. He testified the shirt of the deceased was on fire and that he put it out.

The defendant testified at length, going into detail as to the history of his life and the trouble he had with the deceased interfering with the home life of him and his wife. It is unnecessary to go into further detail with reference to this. He testified that he was attacked by the deceased when they met, and that he was in fear of his life when the shots were fired by him, which killed the deceased. His evidence of the position at the time that the shots were fired was similar to the witness Calhoun. He testified that they were on the ground at the time the

shots were fired, and explained that the shot in the deceased's back was by reason of his reaching around and firing the shot while in that position.

Defendant's wife, Gladys Neece, was placed on the witness stand by the defendant, but enough has been stated of her testimony.

Many witnesses testified as to the good character of the defendant prior to this difficulty.

This is, indeed, one of those unfortunate cases. As a matter of law, it is doubtful if, after the testimony of the defendant himself and the witness J. B. Calhoun, he was justified in taking the life of deceased. We have often held that the breaking up of the home of a person does not justify the taking of human life. Posey v. State, 50 Okla. Cr. 129, 296 P. 527; January v. State, 16 Okla. Cr. 166, 181 P. 514; Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., N.S., 153; Nutt v. State, 8 Okla. Cr. 266, 128 P. 165.

The jury in this case evidently took into consideration all these facts and circumstances when they returned a verdict of manslaughter in the first degree and gave the defendant only six years in the penitentiary. Under the facts and the law, a judgment and sentence of murder would be upheld in this case.

There is no error in the record which justifies a reversal. The defendant had a fair and impartial trial. The instructions fully covered the law of the case and were fair to the defendant. The jury was lenient; and he has been ably defended in his trial and his appeal.

Finding no error, the judgment and sentence of the district court of Okmulgee county is affirmed.

DOYLE, P. J., and JONES, J. concur.