## FRANK MANNING v. STATE.

No. A-1381.   Opinion Filed June 1, 1912.

(123 Pac. 1029.)

1. **JURY—Competency of Jurors—Voir Dire.** (a) A juror cannot be disqualified on his **voir dire** by asking him if it would have any bearing upon him in rendering his verdict in a case if it should develop during the trial that the defendant had prior thereto been convicted of manslaughter, and it is not error for the trial court to refuse to allow such question to be answered.

   (b)   Under certain conditions the fact of a previous conviction for manslaughter of a defendant might be admissible in evidence and become a matter to be considered by the jury under proper instructions from the court.

2. **WITNESSES—Impeachment—Conviction on Criminal Charge.** (a) Where a defendant takes the witness stand in his own behalf, he may be asked if he has ever been convicted of a felony or of any offense showing want of moral character. The purpose of this evidence is to affect his credibility as a witness by showing that he has been convicted of a felony or of any offense indicating a want of moral character. The fact that an appeal is pending from such conviction will not render such evidence inadmissible. It is the verdict of the jury upon such accusation that affects the credibility of the witness.

Syllabus.

3.    **APPEAL—Review—Harmless Error.** While it is improper for
the court to instruct the jury that if they find any witness in the
case has willfully sworn falsely as to any material fact, then the
jury has a right to disregard the testimony of such witness ex-
cept in so far as the same may be corroborated by other facts
and circumstances in evidence, yet the giving of such instruction
will only be reversible error where it appears from the entire
record that the appellant was injured thereby.

4.    **TRIAL—Instructions—Requests—Instructions Already Given.** It
is not error for the trial court to refuse to give a requested in-
struction although it may be a correct statement of the law, if
the principles therein contained have already been given in the
general instructions to the jury.

5.    **SAME—Indorsement of Names of Witnesses—Harmless Error.**
(a)   For circumstances under which the trial court was justified
in finding that in a capital case the name of a witness was fur-
nished the defendant more than two days prior to the day on
which such case was called for trial, see opinion.

     (b)   The law does not prescribe the manner in which the
names of witnesses in a capital case shall be furnished the defend-
ant.   If it be made to appear to the satisfaction of the trial
court that such names were furnished the appellant at least two
days before the case was called for trial, the manner in which
the names were so furnished becomes immaterial.

     (c)   Where a witness in a capital case is permitted to testify
over objection that the name of such witness was not furnished
the defendant two days before the case was called for trial, such
failure to furnish the defendant with the name of such witness
and permitting such witness to testify will not be reversible
error where it is shown that the witness did not testify as to any
material fact against the appellant.

6.    **APPEAL—Harmless Error—Opinion Evidence — Presumptions —
Sufficiency of Evidence.**   (a) The admission of incompetent evi-
dence is not ground for reversal of a conviction unless it affirm-
atively appears from the record that the appellant was injured
thereby.

     (b)   A doctor should not be allowed to testify to his opinion
as to the position the body of the deceased may have been in
when he received the fatal wound; but, where from an inspection
of the entire record it appears that the defendant was not injured
by the introduction of this incompetent evidence, it will not be
ground for the reversal of a conviction.

     (c)   When the wife of a defendant is a material witness in
his behalf and she is not placed upon the stand by him or her ab-
sence is not accounted for by the defendant, this becomes a cir-
cumstance to be considered against the defendant.

(Syllabus by the Court.)

*Appeal from District Court, Tulsa County;*
*L. M. Poe, Judge.*

Frank Manning was convicted of manslaughter in the first degree, and his punishment assessed by the jury at eight years' imprisonment in the state penitentiary, and he appeals. Affirmed.

*Giddings & Giddings,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *Redmond S. Cole,* Co. Atty., for the State.

FURMAN, P. J. First. Upon the trial of this case when the jury were being examined on their *voir dire,* counsel for appellant propounded the following question to the juror Kelly:

"Mr. Kelly, if it should develop in the trial of this case that the defendant had at one time prior in his lifetime been convicted of manslaughter in the second degree, and that the case was now pending in the Criminal Court of Appeals of this state, would that have any effect or bearing upon you in rendering a verdict in this case?"

The question was objected to as incompetent. The objection was sustained, and the appellant excepted to the ruling of the court. We do not think that the court erred in sustaining the objection to the question as asked. In the case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, this court expressly decided that, where a witness had been convicted of a felony or of any offense which indicated a want of moral character, this was a proper fact to be admitted in evidence and considered by the jury as affecting his credibility as a witness. Again, if upon the trial appellant had offered evidence of his previous good character for peace, it would have been competent for the state to prove this previous conviction in rebuttal. These are the only two contingencies in which such previous conviction could be developed upon the trial, and in both of them it would have been proper and necessary for the jury to consider such conviction in arriving at a verdict.

Second. Upon the trial of this case when appellant was upon the witness stand in his own behalf he was asked the question, "Were you ever convicted of manslaughter?" to which appellant objected, and, the objection being overruled, appellant answered

"Yes, sir." It is objected that this evidence was inadmissible because the appellant had appealed from such conviction, and that at the time of this trial the case in which appellant had been convicted of manslaughter was pending in the Criminal Court of Appeals, the proposition being that, as the case was upon appeal, the conviction was not necessarily final. The sole purpose of evidence of this kind is to affect the credibility of a witness. This purpose is accomplished by showing such conviction, even though the conviction may have been reversed upon appeal. If the conviction had been reversed because it was contrary to the evidence, this might be shown in behalf of such witness. Many courts hold that for the purpose of impeachment a witness may be asked if he has ever been arrested or accused of an offense. For the reasons given in the case of *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, this court holds that the mere fact that a witness may have been accused of an offense could not be proven for the purpose of affecting his credibility, but we think that where a witness has been tried for a felony or for any crime which indicates a want of moral character, and the case has been submitted to a jury, and they have found from the evidence that he is guilty, this fact may be given in evidence to the jury for the purpose of affecting the credibility of the witness. The law presumes that the jury was intelligent and impartial and that they would not find a man guilty upon mere suspicion or an accusation of his enemies. It is the verdict of the jury upon such an accusation that affects the credibility of the witness. Prior to a trial and verdict of guilty the law presumes that a defendant is not guilty, but, when a jury selected in part by a defendant finds that he is guilty, this presumption of innocence is wiped out and the opposite presumption, that he is guilty, prevails. We therefore hold that the court did not err in overruling the objection to this evidence.

Third. Upon the trial of this case the court instructed the jury as follows:

"And if you believe that any witness in the case has willfully sworn falsely to any material fact, then you have the right

to totally disregard his testimony except in so far as the same may be corroborated by other facts and circumstances 'in evidence."

This instruction is erroneous, but is not necessarily reversible error. See *Henry v. State,* 6 Okla. Cr. 430, 119 Pac. 278. Upon the entire record in this case the jury would have been warranted in finding that appellant had willfully sworn falsely to material facts, but his testimony was in some respects corroborated by the testimony for the state. We therefore feel that this instruction benefited appellant and is not ground for reversing this conviction.

Fourth. Counsel in their brief complain of the action of the trial court in refusing to give certain special instructions requested by appellant upon the trial. We have examined the instructions requested and find all of the issues involved in this case fully set forth in the instructions given. It is not error for the trial judge to refuse to give a requested instruction, even if it may be a correct statement of the law, if the principles therein contained have already been given in the general instructions.

Fifth. Upon the trial of this case the state placed Madona R. Kenefick upon the witness stand, and the following occurred as appears of record:

"Mr. McNeill: Comes now the defendant and objects to the introduction of the testimony of the witness for the reason that the name has not been indorsed upon the information in this case. The Court: Has there been any notice served that this witness was to be used? Mr. Sturgis: Yes, sir. The Court: When? Mr. Sturgis: The 29th day of March. At this time we will ask leave to indorse the names of the witnesses on the information included in this notice. The Court: Yes, sir; leave will be given to indorse the names which have been served. Mr. McNeill: To which defendant objects as prejudicial to the rights of the defendant; said leave not having been asked prior to the time of the trial. Mr. Cole: If the court please, we ask permission at this time to show the service that was made of the list of witnesses to be used by the state in its case in chief on the defendant in this trial, the same having been served on the 29th day of March, 1911. The Court: Who served them?

Mr. Cole: Served by the sheriff. The Court: · Where is his return? Mr. Cole: His return has not been made. We ask permission at this time·to let the return show that it was made. The Court: Make your return. Let it be shown. (Mr. Cole hands paper to counsel for the defendant.) The Court: Let these names be indorsed on the information. Mr. McNeill: Comes now the defendant and objects to the indorsing of the names on the information for the reason that the same is done after the trial has begun, and the record fails to show or disclose that any list of witnesses had ever been served upon the defendant or defendant's counsel according to law, no proper return shows the list of witnesses as having been made, and for the further reason that the defendant has the right to rely upon the names indorsed upon the information at the time of beginning of the trial, the indorsement of said names after the trial proceeds becomes prejudicial to the rights of the defendant. The Court: No; overruled. Mr. McNeill: Note an exception."

It will be noticed that counsel for appellant do not deny that appellant was furnished with the list of witnesses on the 29th day of March, but they stand upon the ground that the sheriff had not made a proper return and the further ground that the indorsement of the name of such witness was prejudicial to the rights of appellant because made after the trial had begun, but they fail to show wherein this prejudice existed, and they cite no authorities in support of their contention. The record shows that this case was called for trial the 3d day of April, 1911. We think that the court was justified in finding that the name of this witness was furnished appellant on the 29th day of March, four days before the case was called for trial, notwithstanding the fact that a formal return of such service had not been made. The point was that the name of this witness had in fact been furnished appellant. The question of a formal return was immaterial. But even if we are wrong in this, and if the court did err in permitting the name of this witness to be indorsed on the information and to testify in this case, the error was harmless, because an inspection of the record shows that her testimony related altogether to matters which did not at all affect the rights or involve the guilt or innocence of appellant.

Sixth. In the supplemental brief filed by appellant it is contended that this case should be reversed because the trial court erred in allowing Dr. William M. Moore to testify as to the position of the body of the deceased when the shots were fired. We think that the admission of this evidence was error. See *Byers v. Territory,* 1 Okla. Cr. 699, 100 Pac. 261, 103 Pac. 532; *Price v. United States,* 2 Okla. Cr. 449, 101 Pac. 1036, 139 Am. St. Rep. 930. In the Byers case this court refused to reverse a conviction where evidence substantially the same as this was introduced, holding that, while it was incompetent, yet in view of the entire testimony introduced there was no reason to believe that appellant was injured thereby. In Price's case we again held that this evidence was incompetent and reversed the conviction because from the whole record it appeared the appellant was injured by its introduction. See these two cases for a full discussion of the principles of law involved.

We think that this case does not come within the rule laid down in the Price case, but comes clearly within the rule laid down in the Byers case. There was no eyewitness in the Price case, and the only evidence upon which the state relied to secure a conviction was the testimony of two physicians as to their opinion of the position of the arm of the deceased at the time he received the wound, based upon the range of the bullet after it entered his body, and it was upon this testimony alone that the appellant was convicted. But the case at bar presents an entirely different condition of affairs. The evidence of the physician as to his opinion of the position of the body of the deceased at the time the fatal wound was received is not corroborative of the evidence upon which appellant was convicted, and we do not believe that it tended to his conviction. In this case there were two witnesses besides appellant who saw this difficulty. One of these witnesses was the wife of appellant. She could not be called as a witness for the state, but appellant could have placed her on the stand if he had desired to do so, and the fact that he failed to place his wife on the witness stand is a circumstance strongly tending to prove that the testimony of Overstreet, the

state's witness, was true, and the testimony of appellant was false.

In *Mercer v. State,* 17 Tex. App. 452, that court said:

"In substance, the state's attorney reminded the jury that the witness Sarah Vaughn testified that her father confessed his paternity of the child to his wife, threatened to kill himself, and expressed his opinion that the said Sarah ought to be willing to go with him to the grave. He reminded the jury of the fact that it was beyond the power of the state to produce the wife as a witness against her husband, but that it was within the defendant's power to produce her as a witness in his behalf, and disprove, if he could, the confession deposed to by the said Sarah. The counsel argued that the defendant's failure to produce his wife, who was accessible, was a fact corroborative of the testimony of the witness Sarah. The court overruled objections to this line of argument. It was disclosed by the evidence that the defendant's wife must have known important facts bearing directly upon the issue in the case, and that she was within easy reach of the process of the court. She could have explained fully the occurrence testified about by his two daughters when he got his gun and said he would blow his grains out. She could have testified, perhaps, to many other facts which would have shed light upon this horrible transaction. It was not within the power of the prosecution to adduce her testimony because, being the defendant's wife, she was not permitted under the law to testify against him in this case. He alone could call for her testimony and compel its production. Her knowledge of the facts, whatever that knowledge might be was at his command— was within his reach—and without he produced it, or consented to its production, it was a sealed book, which no human tribunal has the power to open against him. Under these circumstances, we think the prosecuting attorney was justified in the remarks complained of, and that the court did not err in its action in relation thereto."

We have passed upon this question in two cases. See *Rhea v. Territory,* 3 Okla. Cr. 230, 105 Pac. 314; *Hampton v. State, infra,* 123 Pac. 571.

William Overstreet testified for the state as follows:

"I have known Frank Manning for nine years. On November 25th I went to his home north of Pawnee to borrow a horse. Saw Kenefick, Manning, and Manning's wife in the kitchen; the men seated at the table. Manning and Kenefick were quarreling

and something was said about whipping somebody; I couldn't get the name. I went into the northwest room and started the graphophone. In a short time Manning and Kenefick followed me into the room and sat down. They were chewing the rag about something and once got up and acted like they wanted to fight. I told them to sit down and listen to the graphophone and they sat down. I couldn't tell what they were talking about on account of the noise made by the graphophone. After a bit I heard a noise back of me and turning saw Manning on the floor in the corner and Kenefick on him. I pulled Kenefick off and pushed him to my right and as Manning got up I pushed him to my left. They had not said anything that I heard. I said, 'What are you fellows doing?' Manning stepped back a short distance and said to Kenefick, 'You son of a bitch, I ought to kill you.' Kenefick made no reply and did not make a move. Manning took his automatic gun out of his pocket and made a rush at Kenefick. I grabbed for his gun but missed and he hit at Kenefick's head. He had the gun in his left hand, and I suppose he hit him. Kenefick was then sitting on a chair. Manning fired around me twice at Kenefick. Don't know whether either of the shots took effect. I took hold of Manning and backed him into the bedroom adjoining the room we were in and tried to get his gun. I said, 'There ain't no use of having trouble like this.' Manning replied, 'You take Kenefick out of here and everything will be all right.' I left Manning and went back to Kenefick. I said, 'Joe, come on and get into the buggy and go with me to town. There ain't no use in having trouble like this.' Joe never said a word. He was just standing there in the northwest room. We started and got into the kitchen, and he stopped on me. I tried to take him out by force, but he torn loose from me and went back into the northwest room. He didn't say anything at all. I stepped on outdoors, and on the steps met Mrs. Manning. I went on about six steps when Mrs. Manning called to me. I turned round and saw Kenefick and Manning talking in the northwest room. Kenefick was standing on the west side of the door leading into the bedroom. Manning was standing right in front (east) of him, and I was right on the east of them all. Mrs. Manning wanted me to go back in the house, but I told her I had done all I could do. They stood by the door leading into the bedroom talking. They were from a foot and a half to two feet apart. I heard them talking and heard Kenefick say 'Frank, I'm a good Irishman, shoot me if you want to.' Manning stepped back east two or three steps and said, 'You son of a bitch, I will,' and commenced

firing. He shot three times. I had started home because I saw trouble brewing. But I didn't expect Kenefick to do anything. I went out to the buggy and then on to town. Was gone just a short time and returned with Albert McGuire. Kenefick was not yet dead. Manning was gone, and Mrs. Manning was there alone. Kenefick died in a very short time after I returned. I found three empty .32 shells near where he was laying. Sheriff Pumroy was the next to arrive. Kenefick had no weapons during the evening."

Charles I. Pumroy, called on behalf of the state, testified substantially as follows:

"My name is C. I. Pumroy. I was sheriff of Pawnee county on November 25, 1910. I first saw the defendant Manning at Jay's drug store where he was leaning back against the showcase smoking a cigar. I told him to come with me. He asked, 'What for?' I told him I wanted to take him over to the jail, and he again asked what for. I told him I had just been informed that he had shot a man down at his house, and I would have to arrest him. He asked, 'You are not going to arrest me for that are you?' I went to Manning's home and found a dead man, whom I learned was Kenefick. I found a .32 copper jacked bullet in his union suit. The next morning I went back and found two empty .32 cartridges near the northeast corner of the room. After I had arrested Manning I asked him what the trouble was about. He said he was a child of misfortune and couldn't take things that you fellows could. I asked him how it happened, and he stopped off and says, 'Charley, you are no lawyer,' and I says, 'No, I ain't,' and that ended the conversation for the time being. When we examined Manning at the jail we found no marks or bruises on his person."

Joe Wierman, called by the state as a witness, testified that defendant came to his home on the night of the homicide, did some phoning, and said he had shot at a man four times. Jesse Wilson, called by the state, testified that he was at the home of Joe Wierman that evening and heard Manning say he had "shot a son of a bitch four times." Mrs. Joe Wierman testified to the same as Jesse Wilson.

It is true that appellant did testify to a state of facts which, had it not been for the doctrine of mutual combat, tended to make out a case of self-defense. If his testimony was true, why was it he did not place his wife on the witness stand to

corroborate his statement? She was present and was a competent witness. in his behalf.

Under all of the evidence in this case we cannot say that the verdict is contrary to the testimony. In fact, we are fully convinced that appellant is guilty of at least manslaughter in the first degree. According to the entire evidence, this was a case of mutual combat, and a defendant cannot be heard to say such a killing is justifiable upon the ground of self-defense. See *Boutcher v. State,* 4 Okla. Cr. 576, 111 Pac. 1006; *Koozer v. State, ante,* 123 Pac. 554.

There is nothing in the record which causes us to believe that appellant was injured by any of the errors pointed out in this opinion.

The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG and DOYLE, JJ., concur.