# HENRY WELCH v. STATE.

No. A-3170.   Opinion Filed Nov. 18, 1919.

(185 Pac. 119.)

1. **APPEAL AND ERROR—Briefs—Abandonment of Errors Assigned.** Errors assigned in a petition in error which are not argued in the briefs will be treated as abandoned and not be considered by this court.

2. **APPEAL AND ERROR—Harmless Error—Evidence.** The exclusion of offered evidence tending to show a want of credibility on the part of a witness for the state, who testified to a statement made by a defendant, is not reversible error, where such defendant as a witness admits that he made such statements.

3. **WITNESSES—Impeaching Evidence—Inadmissibility for Irrelevancy.** The rejection of offered evidence as to why a witness was up at a late hour of the night, and that just prior to a homicide he was engaged in gambling in a place where whisky was sold, said place being some distance from the scene of the homicide, and said offered evidence being in no wise connected with the crime for which the defendant was on trial, is not error.

4. **WITNESSES—Credibility—Proof of Specific Acts.** The credibility of a witness cannot be successfully attacked by proof of specific acts done by such witness.

5. **TRIAL—Instructions—Repetition.** It is not error to refuse a requested instruction which correctly states the law, if the general instructions given sufficiently cover the principle of law stated in the requested instruction.

6. **APPEAL AND ERROR—Harmless Error—Instructions.** An instruction embodying an abstract proposition of law should not be given, but the giving of same does not constitute reversible error, unless a miscarriage of justice or a denial of a defendant's constitutional or statutory rights has resulted therefrom.

*Appeal from District Court, Muskogee County;*
*R. P. deGraffenried, Judge.*

Henry Welch was convicted of murder, and he appeals. Affirmed.

*M. G. Bailey* and *W. J. Crump,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, Henry Welch, hereinafter called defendant, James Meiggs, and Louis Benge, were informed against jointly for the murder of T. W. Smoot. The defendant was tried separately, convicted, and sentenced to imprisonment in the penitentiary at McAlester during his natural life. To reverse the judgment rendered, he prosecutes this appeal.

The defendant, as a witness in the case, admitted that in territorial days he had been convicted of, and served a sentence in the penitentiary for, robbery; that he fired the shot in the colored waiting room which killed the deceased; that he was marshal of Ft. Gibson, but that during the trouble in said waiting room he did not in any way attempt to exercise his authority as such marshal; and that after he shot the deceased he did not stop to see the effect of such shot, but ran out of said waiting room in pursuit of a man who was running from the said depot, who was afterwards ascertained to be Hymer; that very shortly after the said shooting, and in response to an inquiry, he made false and contradictory statements as to his knowledge of who shot the deceased; that he was sober at the time of the homicide; and that his codefendants were under the influence of intoxicating liquor.

Hymer testified that on the 4th day of March, 1917, he was railroad agent and telegraph operator employed at the depot of the Iron Mountain Railroad at Ft. Gibson, his hours of work being from 4:30 in the evening until 1 the next morning; that he remembered the killing of T. W. Smoot that night; that he and his wife, after closing the office door, which was self-locking, were leaving the depot

at about 12:45, and in order to do so had gone into the colored waiting room of the said depot, into which came the defendant and his two codefendants, one of whom stood at the entrance of said room; that at that time he did not know them, but has since ascertained that they were the defendant, Jim Meiggs, and Louis Benge; that Jim Meiggs approached and searched him and said, "If you have got a gun on you, or whatever you have got on you, give it to me"; that the witness replied: "Gentlemen, I have not got a cent of money, let me go"; that when searched he had upon his person a gold watch and a card case, which watch was not taken and which card case was not gone through; that while he was being searched the defendant stood close to Meiggs, and Benge walked over to the witness' wife and said something to her which the witness did not understand; that the witness and wife were permitted to leave the depot and went to the McBride Building to Mr. Smoot's room, leaving the said three men standing in the waiting room, and that they followed them; that witness and wife kept ahead of them; that, on reaching Mr. Smoot's room, they found him preparing to go to the depot; that they informed him of what had occurred at the depot; that Mr. Smoot completed his toilet, armed himself with a shotgun, and went with the witness and his wife to the said depot; that Mr. Smoot entered the colored waiting room first, that witness followed, and that his wife followed him; that Mr. Smoot at the time held the gun under his arm; that Jim Meiggs, the man who had searched the witness, came into the waiting room; that the defendant was looking from the outside into the room through the window; that Mr. Smoot said to Meiggs, "Are you the fellow that is causing this disturbance," or "this trouble?" and Meiggs made a reply

which, witness did not hear; that Meiggs and Smoot went immediately to fighting; that Smoot laid down his gun on the floor or let it fall and that, witness started to assist Mr. Smoot; that the defendant came into the room hurriedly and joined in the fight against Smoot; that witness tried to find something to fight with and could not, and went out to a pile of cinders and picked up two or three cinders, and returned to the room where the men were still fighting Smoot, and threw two or three cinders at Meiggs and Welch; that at this time Benge came from the door, and witness threw a cinder at him and struck him and thought he knocked him down; that he returned for more cinders, and as he stepped out of the door heard a shot fired in the waiting room; that he got another cinder and returned to the waiting room, and saw the defendant standing there over Smoot's dead body; that he threw at him and struck him in the face and returned to get more cinders, and looked around, and that defendant was holding his gun on him, and that witness began to run; that Meiggs hollored, "Shoot him, shoot him," and was using profane language towards him; that the defendant followed him, and that he finally heard defendant say that he was the marshal, and witness said, "If you are the marshal, I will stop," and defendant advanced up to him, having his gun in his hand, and repeated that he was the marshal, and that witness replied, "You have not acted like a marshal," and said to him, "Let's go and hunt my wife"; that the defendant went with the witness, and that witness said to him he wondered what happened to Mr. Smoot, that he believed he was hurt, and suggested that they go back and see where Mr. Smoot was; that the defendant said, "You want your wife, and we will go find her"; that they went back to the McBride Building and

got his wife, and again returned to the depot, where a crowd of men had then gathered; that they went into the colored waiting room and there found Mr. Smoot's dead body and removed it.

The witness further testified that when the fight started his wife was in the colored waiting room near the door and that after the removal of Smoot's body he saw Smoot's gun lying on the table in the ticket office; that after the homicide he heard the defendant tell Mrs. Smoot, while standing in front of the McBride Building on the night of the homicide, that a man had been knocked down, but nobody hurt except that. Witness further testified that there was no light in the colored waiting room at the time of the difficulty, but that there was some light reflected through the stained glass door of the office and from an arc light in the street about 100 feet from the east side of the waiting room, and that the light was sufficient during the difficulty to identify the people in there, and that he did at the time identify the defendant and his codefendant.

Mrs. Hymer testified that, on the night of the homicide, she was at the depot with her husband; that about 12:45 they stepped out of the office door, closed it, and went into the colored waiting room, leaving the money and the key to the money drawer in the office; that three men came into the said room, and that while one of them, Mr. Welch, searched her husband, another of them, Louis Benge, came over to her and told her to hold up her hands and keep still, that they were not going to hurt him; that the defendant was standing right close to Meiggs when Meiggs was searching her husband; that they were then permitted to leave and proceeded to Mr. Smoot's room. This witness further testified as to what occurred

thereafter up to the firing of the shot that killed Smoot, substantially the same as testified by her husband, and that Smoot did not fight with his gun, but put it down or dropped it when the fight began.

Leonard Logan testified that he remembered the circumstances of Mr. Smoot being killed the previous March at Ft. Gibson; that on the morning after the killing he saw the defendant in the Capitol Hotel with Mr. Benge, and some one asked the defendant who did the killing, and he said he did not know.

Henry Maddox testified that he knew and had known the defendant several years; that the defendant was town marshal of Ft. Gibson; that witness recalled the killing of Smoot at the depot in Ft. Gibson; that he was at the depot the night of the killing; that after the killing he had a conversation with the defendant and asked him where he was at the time of the killing, and that defendant replied that he was standing right at the window between the baggageroom and the depot and saw the killing, and did not know who did it, and witness asked defendant why he did not go down and arrest him, and the defendant kept standing there, and that he caught him by the arm and said, "Let's go down there and see the operator"; that Wade Johnson, defendant, and witness went to the depot, and the defendant went in and stepped right back, and witness asked him who killed this fellow, and he said this operator killed him, and witness asked defendant why he did not arrest him, and again asked defendant who killed Smoot, and defendant replied that he did not know.

Wade Johnson testified that he remembered the circumstances of the killing of Smoot at Ft. Gibson, and knew and saw the defendant about that time in front of

the old McBride Building, when Mr. Maddox was present, and Hymer and his wife were talking, and Maddox asked the defendant who killed Smoot, and he replied that he was on the southeast side of the colored waiting room, outside, heard the shot, but did not know who did the killing. The defendant offered to prove by this witness, if permitted to do so by the court, and for the purpose of affecting the credibility of the said witness, that on the evening of the 3d of March, and up to about 1 o'clock in the morning, the witness with Henry Maddox were engaged in playing poker and drinking. The court sustained an objection to the evidence, and the defendant excepted.

Ran Lee testified that he knew the defendant and remembered the circumstances of the killing of Smoot at Ft. Gibson the previous March; that he was at the depot that night, or early on the morning of the killing; that he learned who did the killing, went to the telephone office and called Mr. Sam Benge, who is a constable, was answered by Benge's wife, and told her what had happened; that there was no light in the colored waiting room; that there was sufficient light through the doors to identify persons in the room, but in the corner where Mr. Smoot's body was it was a little dark; that he looked for and found the body; that he did not see any gun around there; that he saw Sam Benge that night; that they found the defendant 15 or 20 feet from the coal box south and west of the depot; ran up to him and told him they wanted his gun; that they searched him and did not find it and asked him where it was, and he said it was in his coat pocket and he would give it up; that there is an arc light in the street about 100 feet from the depot that shines directly through the two east windows of the depot, and a light across from the street car line back south and west of the depot

that shines right in the southwest window of the depot; and that you could recognize a man anywhere in the colored waiting room, except where Mr. Smoot's body was.

Sam Benge testified that he was a constable; knew the defendant; that he was at the depot of the Iron Mountain Railroad in Ft. Gibson the night Smoot was killed; that he was called there and arrested the defendant, who was walking away from the depot; that he took him to the Capitol Hotel in town, and asked him if he did not hear the shot, and he said "Yes," and if he did not see the man that fired the shot, and he said, "No," that he was in the north end of the building, that a fellow ran out of the negro waiting room and he stopped him, and he said he was the night operator; and that afterwards defendant told witness, "There is no use in my trying to deny the shooting, for they found the cartridge out of my pistol in the waiting room," and said he would not have shot the fellow if he had known he was Smoot.

The state then offered in evidence, as Exhibit I, defendant's pistol, and, as Exhibit Z, the bullet found in the clothing of Smoot after his death; as Exhibit 3, the empty cartridge shell found in said waiting room after the shooting; as Exhibit 4, the coat worn by the deceased at the time he was killed. To the introduction of each of the said exhibits the defendant objected, and separately excepted to the introduction of said exhibits in evidence.

Sam Benge further testified that, after the arrest of the defendant, he pulled a hat out of his pocket which he said was Louis Benge's, and requested that it be given to him, which hat was placed in evidence as Exhibit 6 against the objection and exception of the defendant.

Wm. Ross Adair testified that he was telegraph operator and ticket agent for the Iron Mountain Railroad at Ft. Gibson at the time Smoot was killed; that he heard the shot and ran over to the depot where Mrs. Hymer was hollering; that he went into the negro waiting room, where he found the body of Smoot behind a bench pulled out from the wall, and that a shotgun was resting on the arm of the bench which was pulled out; that he did not see it until the light was turned on.

The defendant offered to prove by this witness that three of the state's witnesses were at Henry Maddox's engaged in a poker game and drinking whisky from about 8 o'clock until just before witness heard the shot fired that killed the said Smoot, for the purpose of affecting the credibility of the witness. The court excluded the said offered evidence, and the defendant excepted.

Louis Benge, a witness for the defendant, testified that he was born, reared, and lived at Ft. Gibson; that he knew the defendant, Jim Meiggs, and Mr. Smoot prior to his death; that he had met Mr. and Mrs. Hymer; that, on the morning of the 3d day of March last, he was with the defendant and Jim Meiggs; that he had been drinking considerably; that they got together on the street about Garland's Drug Store; that he heard Meiggs say to Welch that he had had trouble with a negro; that, after they got together and went to where a negro dance had been going on, it was closed, and they went on down to the Iron Mountain depot and noticed a man and woman standing in there; that Meiggs went up to the man and searched him, and asked him what he had on; that the defendant pushed Meiggs away and said, "Let that man alone"; that the man was a white man, and who afterwards proved to be Mr. Hymer; that Hymer and Mrs. Hymer left, and

they followed them; that they lost track of them and re-
turned to the depot, and, as witness started in at the door
of the depot, he saw the back of a man in front of him;
that something struck him in the head and knocked him
out; that the said blow made the scar on his head which
he exhibited to the jury; that when he came to himself he
was standing on the outside of the depot bareheaded; that
he heard some one say, "Kill the son of a bitch," and he
left the depot; that, so far as he had knowledge, neither
he nor Meiggs nor the defendant had any intention at the
time they went to the depot of robbing anybody; that he
did not remember whether or not he said anything to the
lady there that night; that he saw her; that Mr. Smoot
and Mr. and Mrs. Hymer must have beaten them back to
the depot; that the second time he went back to the depot
he did not do anything; that the defendant and Meiggs
left him at the sidewalk and went up the path to the depot,
and he went right back to the depot, and started in when
he was struck on the head; that they were looking to see
where the man and woman had gone; that there was an
arc light sign there, and he could see them; that the de-
fendant was the marshal, and he wanted to see what he
would do with them if they found them—"wanted to see
the fun"; that he and Meiggs were pretty drunk and
rowdy, and the marshal, the defendant, did not arrest
them; that he was pretty drunk, but knew pratically every-
thing he did; that he and Meiggs were staggering around
with the city marshal of Ft. Gibson looking for the man
and woman; that it was light enough when he got inside
the room to recognize that the man and woman were
white people; that he did not deny walking over to Mrs.
Hymer and saying, "Keep still, they will not hurt him";
that, when they first saw the man and woman, he and

Meiggs and the defendant were all together; that principally he was not looking for any negro; that he went to his brother's house and got a Winchester and returned to the depot.

James Meiggs testified:

That he had lived at Ft. Gibson all of his life. That he knew Louis Benge and the defendant and Mr. Smoot. That he knew Mr. and Mrs. Hymer when he saw them. That he was at the depot of the Iron Mountain Railroad in Ft. Gibson with Louis Benge and the defendant on the morning of the 4th of March last. That prior to the homicide he had been struck by some one, he thought a negro, as he was coming out of "a colored drinking joint." That he met the defendant at Garland's Drug Store and informed him that he had been struck in the face and knocked down. That he went back to the joint where he had been struck, and that it was closed up. That he went down to the Iron Mountain depot and saw some one in the negro waiting room. That he stepped in front of Welch and commenced searching the man, thinking he was a negro, and that the defendant came up and pulled him back and said, "Leave him alone, he is a white man." That he came back out and came around the depot and saw the woman on the sidewalk. That he had not seen her before. That they started uptown; that it was late in the night. That they walked on uptown behind the man and woman and lost them, and did not see them any more. That he thought they turned in through an alley. That they came back to the depot, and that he did not remember Benge being with them. That some noise attracted him, and he went into the colored waiting room, and as he stepped inside of the room he got hit on the head. That he did not know just what happened then.

That he did not think he was knocked down. That he heard the defendant say, "Put that gun down," and some one said, "I will kill you," and about that time the shot was fired. That he walked out of the depot, and, the next thing he remembered, Hymer was running up the street and defendant hollering after him to halt, and that while Hymer was running witness raid, "Shoot the son of a bitch and he will stop." That at the time he searched Hymer he did not know he was a white man. That there was no light in the room. That there was an arc light in the middle of the street about 100 feet distant that reflected light through the doors and windows of the said waiting room. That he did not, nor so far as he knew did Benge and Welch, have any idea of robbing Hymer. That he did the searching because he had no gun. That it is the custom with an officer who has no gun to do the searching and the one with the gun to stand back. That his purpose in following on behind the said couple when he went to town and in going back to the depot was "that he thought the woman was a street whore." That women of that character generally hang around the depot. That when he was an officer he had arrested such characters there. That he went back to the depot and found his hat. That, while he was looking for his hat, several people came. That he did not know at that time that Smoot had been killed and suggested breaking down the office door. That he and Ran Lee tried to break the door in. That he told Ran Lee, if Smoot was killed, then the defendant killed him, as he was the only one who had a pistol: That on the day of the preliminary Ran Lee met him on the street car and said to him that Cotton and he did not want to prosecute him and Louis, "but we have to stick the defendant," to which he replied:

"Well, he was going to swear all he remembered about it and no more. If it sticks the defendant then stick him; and if it won't, it won't."

That Ran Lee talked on a little while about different things, and then said, "You boys can do it," and said that witness had told Sandy Blake at the depot that "Henry Welch had killed that man for nothing in the world." That witness replied "Ran, I did not tell him any such damned thing," and that Ran Lee said, "Yes, you did, you sure told me that down there," and that witness replied that he could not have told him that, as he did not know Smoot was dead until they came down and found him. That Ran kept talking, and directly said, "Yes, you sure told Will Adair and him that." That witness said, "I thought you said a while ago that I told you and Sandy Blake." That Ran replied, "Well, it was one of us." That Ran Lee looked like he was half drunk that night. That the witness was drinking "Choc" the night he was in the negro joint. That a negro hit him as he stepped out the door. That he could not account for the negro hitting him. That he threw a rock back at the negro and then went and found the defendant. That he did not know that he was looking particularly for the defendant, but ran into him and told him about it. That it had been several months since he had a steady job.

Henry Welch, the defendant, testified:

That he was the marshal of Ft. Gibson. That about 1,600 people live there. That he did not remember seeing Mr. and Mrs. Hymer before that night. That he was well acquainted with Mr. Smoot, Bill Adair, and Sandy Blake. That the arc light in the street threw light on the depot grounds, and that as he was passing he saw a man standing in the colored waiting room. That on the night

of the homicide he had as marshal arrested several persons and put one of them in jail. That he knew his codefendant and met him that night at Garland's Drug Store. That Meiggs had blood on his face and his eye was swollen. That he told witness that it occurred at the brick restaurant where the negroes were having a dance, and that the negroes down there had guns. That they decided to find them and went to the brick restaurant and found it closed, and then went to the station, passed the white waiting room, and went on to the colored waiting room. That they saw a man standing on the inside. That Meiggs went in first and he followed, and saw Meiggs standing up in front of the man as though he had his hand under his coat, and he, seeing that the man was white, took hold of Meiggs pulled him away and told him not to bother him. That as far as he knew up to this time they had not seen any woman in the room. That he heard a woman speak, looked up, and saw her in the east door. That as soon as he pulled Meiggs away the man and woman went away together, going east up the sidewalk. That they followed them and lost them. That he concluded something was wrong about the man and women being out that time of the night, and concluded to try and find them, and went to the Iron Mountain station, heard a man holler, "Oh! Oh! Oh!" just getting weaker and weaker. That he went into the waiting room and saw a man with a gun up in his hands, and that he pulled his gun as quick as he could and hollered at him: "Put that gun down! Put that gun down!" That the man turned the gun on him and said he would kill him, and when he did that he shot him, believing that he intended to shoot witness. That just after that he saw a man run past the east door. That he now knew the man to be Hymer. That he ran out of

the door and took after him and warned him to stop. That the man stopped, and witness walked up to him and took him by the arm and asked him why he was running, and the man said, "Where is Smoot?" That he did not know the man he shot at was Smoot, and that he did not know whether he hit him or not. That then he went up to the old McBride Hotel and saw Mrs. Smoot, who asked him about the killing of Smoot. That he told her there was not anything to it, and that he did not suppose there was; that he did not think there was. That he then went back to the depot, and Henry Maddox went with him, and that he told him he (witness) did not know who shot Smoot. That he did that because Ran Lee came and had a gun and made the remark, "There is one dead man here, and there will be another one," and he did not want any trouble. That Lee did not point the gun at him. That he did not remember what he did. That he did not think he told Henry Maddox that the agent, referring to Hymer, killed Smoot. That he remembered making the remark "that maybe the little agent was the one," but that he did not come out and say that the agent did kill him.

That when he and his codefendant went to the depot they had no idea of robbing anybody, and when they made the second trip to the depot they went back to see if the man and woman had not doubled back to the depot. That he had a suspicion of their being tough characters. That he was 42 years old. That he had once been convicted of robbery and had served a term in the penitentiary, but since that time had had no trouble. That he knew Ran Lee acted as a deputy sheriff, and he thought probably he had a right to carry a pistol, and that was the reason he did not arrest him. That he did not think he told Maddox that he was on the outside when the man was

killed.    That when he talked to Mrs. Smoot he did not know Smoot was killed.    "That he knew he shot at a man and noticed him giving down."    That if he told Maddox that he did not know who shot Smoot he made a false statement.    That he did not attempt to disarm Ran Lee or arrest him.    That he was not particularly afraid of anybody, but still he was afraid that Ran Lee might do something with that gun.    That he talked to Sam Benge about the matter, and that first he told him he did not know who shot Smoot.    That Meiggs and Louis Benge were drinking, but not drunk.    That when he found Hymer and his wife in the waiting room he did not announce to them that he was an officer.    That he did not know why he did not arrest Meiggs.    That he knew for some time prior to the shooting that Smoot was the agent of the Iron Mountain Railroad at Ft. Gibson, but did not recognize him when he stepped into the waiting room and saw him with a gun and hollered to him to throw it down. That after he shot Smoot he ran out after Hymer.    That he did not know whether Smoot dropped the gun or not. That the last time he saw the gun it was out of his sight. That he did not know whether he hit Smoot or not, but left him with a double-barrel shotgun and ran after a man he did not know.    That the only thing that carried him to the depot the second time was to find out if this man and woman were loose characters.    That the first he knew of the shell being found in the waiting room was at the preliminary hearing.    That there never had been any trouble between witness and Smoot.

The defendant introduced several witnesses who testified that they knew defendant, and that his reputation as a peaceable and law-abiding, upright citizen was good;

that the general reputation of Ran Lee for truth and veracity was bad.

T. O. Hymer, being called in rebuttal, testified that, at the time he was being searched by Jim Meiggs at the depot, the defendant did not say to Meiggs, "Let that man alone, that is a white man," and did not say anything to Meiggs, not a word, and that he did not pull Meiggs away.

Mrs. Hymer, being called in rebuttal, testified that, at the time Jim Meiggs was searching her husband at the depot that night, the defendant did not say, "Leave that man alone, that is a white man."

The evidence being concluded, counsel for the defendant, out of the presence of the jury, stated to the court that—

"In their opinion there is no element of manslaughter in the case; it is either murder or justifiable homicide."

Thereupon the court directed that the record show that at the suggestion of the defendant there will not be an instruction given on the question of manslaughter.

The court, together with other instructions, gave the following, to which the defendant excepted:

"You are instructed that if you find from the evidence in this case beyond a reasonable doubt that the deceased, Smoot, at the time of his death was a telegraph operator and was working in the depot station of the St. Louis, Iron Mountain & Southern Railway, then you are instructed that, under the law when entering the depot waiting room, he would have a right under the law to inquire as to the business of any person found in that room."

The defendant requested the court to give the jury the following instruction, which the court refused to do, and the defendant duly excepted, to wit:

"You are instructed that if you believe from the evidence that the deceased and either witness Benge or the witness Meiggs became involved in a difficulty in the Iron Mountain depot, and that the defendant, Welch, entered the room with the idea of suppressing it or stopping the difficulty or altercation, and if you further believe from the evidence that when the defendant entered the room the deceased had a shotgun and made such demonstration as caused the defendant to believe that he was in danger of losing his own life or having great bodily harm inflicted upon him, or if you have a reasonable doubt as to whether such demonstration was made by the deceased and whether the defendant believed at the time he was in danger of losing his own life or having great bodily harm inflicted upon him, then and in that event you are instructed that the defendant had a right to protect himself and is entitled to a verdict of not guilty at your hands."

The defendant timely moved for a new trial, which motion was overruled and exception saved.

Very many errors are assigned in the petition in error, but only the following are assigned and argued in the defendant's brief, viz.:

"(1)    That the verdict of the jury was contrary to the law and evidence.

"(2)    That the court erred in not permitting the defendant to prove on cross-examination of the witnesses Ran Lee, Henry Maddox, and Wade Johnson that they, on the night of the killing of the deceased, Smoot, were engaged in gambling at Henry Maddox's place of business where liquor was also sold.

"(3)    The court erred in giving, over the objection of defendant, instruction No. 12.

"(4)    The court erred in refusing to give, at the request of the plaintiff in error, instruction No. 2."

All errors not assigned and argued in defendant's brief will be regarded abandoned, and the errors so argued considered in the order stated above.

It is true that the evidence is in conflict as to the facts immediately preceding the homicide; but this court, under its rule cited in defendant's brief, "That a judgment in a criminal case will not be reversed when there is substantial evidence reasonably tending to support the verdict," after a most careful reading and consideration of the entire evidence, is of the opinion that there is sufficient evidence to support the verdict rendered, even if the theory of the state, "that the defendant's object in going to the Iron Mountain Railway station was to commit robbery," be entirely eliminated. However, the theory of the state that the defendants intended to commit robbery, we think, the jury, from the evidence, could reasonably believe.

We agree with the opinion, expressed to the court, by the learned counsel for the defendant, "that there is no element of manslaughter in this case, that it is either murder or justifiable homicide," and are unable to say that the jury could have properly returned a verdict that the killing of Smoot was a justifiable homicide.

We are unable to see how, where the witnesses Ran Lee, Henry Maddox, and Wade Johnson were, and what they were doing, prior to the homicide, and in no wise connected with the homicide, was germane to any issue in this case. The purpose of said offered evidence, as stated by counsel for defendant, was to affect the credibility of said witnesses. The defendant himself admitted as a witness that the important part of the said witnesses' testimony, "defendant's denial of knowledge of who fired

the fatal shot," was true, and hence fully corroborated said witnesses. The general reputation of a witness for truth and veracity cannot be shown by his specific acts, and why the witnesses were up at a late hour of the night, where they were, and that they were engaged in gambling at a place of business where whisky was sold, a place some distance from the scene of the homicide charged, was not evidence of want of credibility, even if true. Besides, it was entirely immaterial whether the said witnesses were credible witnesses or not; the defendant having admitted the truth of the material parts of their testimony.

"The truthfulness of a witness cannot be impeached by proof of general bad character for morality, or by proof of specific acts tending to prove want of morality." *Litchfield v. State*, 8 Okla. Cr. 164, 126 Pac. 707, 45 L. R. A. (N. S.) 153.

The requested instruction refused was sufficiently covered by the general instructions of the court, and hence was properly refused.

"It is not error for the trial court to refuse to give a requested instruction, although it may be a correct statement of the law, if the principles therein contained have already been given in the general instructions to the jury." *Manning v. State*, 7 Okla. Cr. 367, 123 Pac. 1029.

We are of the opinion that the instruction numbered 12, given as a part of the general instructions to the jury, was not applicable to any evidence in the case, was abstract, and could not have been given. But we are unable, after an examination of the entire record, to see that the giving of said instruction "resulted in a miscarriage of justice." The court did not commit reversible error in giving said instruction.

"The judgment of conviction will not be reversed on the ground of misdirection of the jury unless in the opinion of this court, after the examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right of the defendant." *West v. State,* 13 Okla. Cr. 312, 164 Pac. 327, L. R. A. 1917E, 1129.

The motion for a new trial was properly overruled.

Finding no error sufficient to warrant a reversal, the judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.