## RIDDLE v. STATE.

No. A-11366.   Oct. 11, 1950.

Rehearing Denied Nov. 1, 1950.

(223 P. 2d 379.)

John W. Tyree and C. S. McCuistion, Lawton, for plaintiff.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant.

JONES, P. J. The defendant, Maudine Virginia Riddle, was jointly charged with her brother, Elbert Emery Riddle, by an information filed in the district court of Comanche county with the crime of murder of one Robert W. Henry on July 13, 1949. Pursuant to the verdict of the jury the defendant and her brother were each sentenced to serve a term of life imprisonment in the State Penitentiary, from which sentence the defendant alone has appealed.

The first question for determination is the sufficiency of the evidence to support the conviction. This proposition was properly presented to the trial court by a motion for an instructed verdict of not guilty at the conclusion of all of the evidence, and also by a demurrer to the state's evidence.

Certain facts are undisputed, to wit:

The defendant, Maudine Virginia Riddle, age 30, and her brother, Elbert Riddle, generally referred to by the witnesses as Bert, age 36, lived in Lawton. Their father owned and operated a drive-in cafe and beer tavern across the street just a short distance from Mary's Drive-In tavern in the north part of the city of Lawton. Katherine Henry, wife of the deceased and Wren Murchison were waitresses at Mary's Drve-In. The homicide occurred just outside of Mary's Drive-In about 11:00 p. m. on July 13, 1949 when Elbert Riddle fired several shots into the body of the deceased as the deceased and his wife were preparing to enter their automobile to go to their home after the closing of the tavern.

400

On the day of the homicide the defendant and her brother had drunk beer at the Red Top Inn, at the Riddle Tavern and had come to Mary's Drive-In about 8:30 p.m. where they also ordered beer. Accompanying the Riddles were Bert Riddle's wife and his small child. While in the tavern the defendant and her brother played a guitar and sang some songs. The deceased, Robert Henry, was also at the tavern and spent the evening sitting near the bar. The deceased at that time was nursing an arm which had not fully recovered from a serious injury. After being in the tavern for several minutes, Bert Riddle pass Robert Henry and in doing so either accidentally or intentionally bumped into Henry's sore arm which caused Henry to complain of his action. A short time later Riddle again bumped into Henry's sore arm, an argument ensued, at the conclusion of which Henry called the police station and two policemen came to the cafe and searched defendant's brother, Elbert Riddle, for a gun.

The evidence of the state showed an intentional striking of the arm of deceased by the defendant on two occasions and remonstrations by the deceased against the conduct of Bert Riddle; that Bert Riddle retorted, "You son-of-a-bitch, if you don't like it what in the hell are you going to do about it?"; that Henry immediately arose, went to the telephone and called the police; that Bert Riddle walked over to his sister, the defendant, Maudine Riddle, and said, "That son-of-a-bitch has called the law, we have got to get out of here", and then said, "No, we will stay"; that Bert then took a gun out of his hip pocket and handed it to the defendant who placed it in her blue jeans pocket; that he then took a pair of knucks and placed them in the guitar case and the defendant took the guitar case and walked out to the car and then returned without the guitar case; that when

she returned to the cafe both defendant and her brother cursed and abused the deceased and also his wife, Katherine Henry; that Cecil Hawkins, the proprietor, asked the two Riddles to leave his place because of the disturbance, and the defendant said the deceased Henry was a damn dirty coward and wouldn't go outside with them; that the officers came and searched Bert Riddle and were unable to find a gun; that the officers suggested that the Riddles leave and shortly after the policemen left, which was about 10:00 p.m., the defendant and her brother left the cafe. At that time the defendant stated, "This isn't the finish of this, we will be back after that son-of-a-bitch". Because of the disturbance that had been created in Mary's Drive In, Mr. Hawkins, the proprietor, decided to close shortly after the Riddles had left. The tavern was then closed about 10:45 p.m. The deceased and his wife, Katherine Henry, walked to where their old model Ford automobile was parked near the tavern. Katherine Henry got into the car while the deceased took the crank and walked around to the front of the car and prepared to crank the motor.

Katherine Henry testified that at that time she heard defendant and her brother whispering just east of the rear of their car; Bert Riddle had a gun in his hand; Riddle then walked around to the front of the car and the deceased commenced backing up, all the time pleading with Riddle not to kill him; Riddle fired several shots into the body of the deceased while he was backing away, and even shot the deceased in the back after he had fallen to the ground and was attempting to crawl away; that just before the shooting occurred Mrs. Henry yelled to her husband that Maudine and Bert had come after him; that the defendant, Maudine Riddle, said, "Now you have got him, I will take care of her", and proceeded to

grab Mrs. Henry which prevented her from running to secure help or call the officers; that the defendant said to her brother, "Go on and kill him, pour it to him"; that Bert Riddle said, "Now I have got you, I am going to kill you, you son-of-a-bitch, I am going to kill you"; that Mrs. Henry jerked loose from Maudine and ran to a neighboring house and called the officers.

Other witnesses verified most of the evidence of Mrs. Henry. Mrs. Rainelli and Mrs. Lewis were sitting in front of the apartment of Mrs. Lewis and saw Bert Riddle and the defendant walk up to the apartment of Mrs. Rainelli and look in. The man had a gun in his hand. That shortly after this occurred the man and woman started back toward the tavern and almost immediately she heard the shots fired which killed Mr. Henry.

After the shooting occurred the deceased was removed to the hospital where he died the following day.

The evidence of the defendant established that she had never had any trouble with the deceased and was not well acquainted with him; that on the evening of the fatal difficulty she did not know anything at all about any argument which occurred between her brother and deceased in Mary's Drive-In until her brother came to her and said someone had called the officers; that she did not talk with the deceased at all on the evening of the shooting; that the officers requested her and her brother to leave the cafe so they went across the highway to her father's drive-in; that they sat around the Riddle tavern for a few minutes and talked and then decided to go to the Dinner House, which was a cafe near-by where they served full meals, for the purpose of eating. When they arrived at the Dinner House her brother felt for his watch and discovered that his watch was missing; he

requested defendant to go with him back to Mary's Drive-In where he thought he might have lost it. As they approached Mary's Drive-In a man she later learned was Mr. Henry came around from the northeast corner of the tavern with a crank in his hand and said to her brother, "You had me in the Drive-In, now, I have got you out here and I'm going to settle it now"; that the man advanced on Bert Riddle with the crank and Riddle retreated. The defendant started backing southwest in the direction of her father's cafe; that Bert Riddle asked the man to drop the crank but he kept advancing on him, striking at him with a car crank; that Bert Riddle finally said, "I will count three and if you don't drop that crank I'll shoot you"; that after Riddle counted three he fired a shot; that after the first shot was fired the defendant started running southwest in the direction of her father's tavern and did not know what occurred after the first shot was fired.

The above is a brief summary of the evidence introduced on behalf of the state and the accused. There were some variations in the testimony of the individual witnesses who appeared for each side but the substance of their testimony is above given.

This court has consistently adhered to the rule that we will not reverse a judgment of conviction on the ground that the verdict is not supported by the evidence, unless there is no substantial evidence tending to show guilt or the evidence fails so far to support the verdict that the necessary inference is that the jury must have acted from partiality, passion or prejudice. Lewis v. State, 81 Okla. Cr. 168, 162 P. 2d 201.

The proof of the guilt of Elbert Riddle of the crime of murder is overwhelming and he was fortunate that

he did not secure the death penalty. He did not, elect to appeal from his conviction. The conviction of Maudine Riddles rests substantially upon statements which she is alleged to have made, hereinabove quoted, which tended to encourage the commission of the homicide.

By statute it is provided:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals." 21 O.S. 1941 § 172.

Although Maudine Riddle did not directly commit the act of shooting the deceased, the jury might reasonably have concluded that she aided in the commission of the crime because of her actions and conduct on that particular night. At the very commencement of the trouble in the cafe, according to the evidence of the state, the defendant took the gun of her brother and concealed it so that the officers could not find it. This constituted an encouragement to Bert Riddle in his unlawful conduct. She was the one who used the utmost profanity in the cafe and as she and her brother started to leave said with an epithet "We'll be back and get you". After that time she remained constantly at her brother's side and instead of trying to dissuade him in an unlawful course of conduct she remained with him and by her conduct and words encouraged him to fire the fatal shots. The jury might reasonably have concluded that had it not been for the association and company of the defendant with her brother and the inciting words which she uttered that no killing would have occurred. We shall further discuss this proposition in connection with the question as to the excessiveness of the verdict.

The next assignment of error is the contention of defendant that the court committed reversible error in permitting eleven of the jurors who had qualified during the impaneling of the jury and before the final selection of the jury to separate and go to their homes overnight.

In support of this assignment of error the record discloses that on October 16, 1949, eleven jurors had qualified for the death penalty and the jury panel had been exhausted when the court decided to take a recess for the day. At that time the court made the following statement:

"The Court: You may be excused until Wednesday morning at nine o'clock, and the other jurors, you may also be excused until nine o'clock Tuesday morning. I mean Tuesday morning, in the morning."

At that time counsel for defendant interposed an objection to the court allowing the jury to separate and called the court's attention to the fact that all of the peremptory challenges had been exhausted and that the panel only lacked one juror of being completed. The court then took a short recess and invited counsel for each side to go with him into his chambers. What there transpired is not disclosed by the record, but upon the return to the court room the court stated:

"The Court: Gentlemen, as you can see, we ran out of a juror. I am going to permit you to go home overnight. It is particularly important in any criminal case and more important in a murder case that a juror keeps his mind in a proper condition to try this case, and it is a matter of imperative importance in this case that you do not discuss this case with any one or permit any one to discuss it with you during the night, and if any one should attempt to discuss it with you, the matter should be brought to the attention of the Court, and if they should attempt to discuss it with you, let them know that you

have just qualified as a juror in this case and they won't discuss it with you any more, in the event you bring such a thing as that to the attention of the Court. At this time we will take a recess until in the morning at nine o'clock. Gentlemen of the jury, you have not heard any evidence in this case and you will not make up your minds as to what should be done in this case; and if anything should occur during the night that should cause you to feel that you are an improper person or an unfit person to try this lawsuit in a proper manner, that should also in the morning be brought to the attention of the Court. During the night we expect to obtain some further jurors. We might get in at least one that can qualify for the trial of this case.

"And you may be excused until nine o'clock. Remember the admonitions that I have given you. All right, nine o'clock in the morning."

On the succeeding morning at the time the court convened the eleven jurors were in the box, at which time the court addressed the following statement to them:

"The Court: The jurors who were excused at the evening hour when we quit last night were cautioned about not discussing this case with any one during the night and that if any one should attempt to talk to you about this case, to report it to the Court.

"May I inquire this morning if any juror who was selected yesterday to serve as a juror, do you know this morning of any matter that has come to your attention which you feel would disqualify you from serving as a juror in this case? If you do know of any such thing, why it would be your duty to report that to the court. (No complaints made by any juror to the court of any matters coming to their attention during the night.)

"You may inquire further, if you desire to."

Neither counsel for the state nor for defendant offered to ask any further questions of the jurors concerning any purported activity on their part during the pre-

ceding night or on any other matter pertaining to their qualifications as jurors.

Counsel for the defendant on the motion for new trial in connection with this assignment of error showed that there was a radio broadcast of the trial proceedings at the close of each day and also showed that the trial received front page publicity in the daily newspapers. No effort was made to show that any one of the eleven jurors who had been tentatively selected heard the radio broadcast or read the newspaper. A transcript of the radio broadcast was attached to the motion for the new trial and is incorporated in the record. It purports to give a factual statement of the proceedings at the trial and there does not seem to be anything in it which was inflammatory.

Counsel cite several cases in which this court held that upon the reasonable request of counsel for either the state or the defendant the court, in a capital case, should keep the jurors together during the trial. Nowabbi v. State, 31 Okla. Cr. 158, 237 P. 868; Horn v. State, 13 Okla. Cr. 354, 164 P. 683; Armstrong v. State, 2 Okla. Cr. 567, 103 P. 658. 24 L.R.A., N.S., 776. In all of these cases, however, it is important to note that the question of the separation of the jury arose after the jury had been impaneled and sworn to try the case.

22 O.S. 1941 § 853, as amended by Session Laws 1945, p. 97, provides:

"The jurors sworn to try an indictment or information, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so them-

selves, on any subject connected with the trial, and to return them into court at the next meeting thereof. Such officer or officers having once been duly sworn, it is not necessary that they be resworn at each recess or adjournment. An admonition to the officer and the jury shall be sufficient."

In the case of Wilcox v. State, 69 Okla. Cr. 1, 99 P. 2d 531, 532, the rules followed by this court pertaining to the separation of a jury have been set forth in the first two syllabi of that case, which read as follows:

"Where the proof shows that the jury is permitted to separate after the case has been finally submitted, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden is on the prosecution to show that no injury could have resulted therefrom to the defendant.

"Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced."

In the body of the opinion in that case many authorities from this court are cited in support of these rules of law. In view of these established rules it would have been necessary for the defendant to have shown that she had suffered prejudice through the separation of the jurors if such separation had occurred after the jury had been selected and before the case had been finally submitted to them. There is no statute requiring the court to keep prospective jurors together pending the selection of a jury. We feel that we should not read into the law an interpretation which would require a more stringent regulation of prospective jurors than is fixed by law for the

regulations of jurors who have been finally selected and are hearing the trial of a case. No effort was made to disclose any particular fact or circumstance showing improper conduct on the part of any one of the prospective jurors, and since no showing has been made that defendant was prejudiced by reason of the court's conduct in allowing the prospective jurors to separate overnight, it is our conclusion that there is no reversible error in such action by the court.

It is next contended that the trial court erred in refusing to permit counsel for the defendant to cross-examine Katherine Henry. This assignment is directed at the action of the court in sustaining the objection of the county attorney to questions asked by counsel for defendant of Katherine Henry as to when and where she and deceased had been married and concerning her alleged relation with a man by the name of Maddox and certain purported conversations with the wife of Maddox which occurred subsequent to the homicide.

Katherine Henry had testified that she was the wife of deceased and all of the testimony by the witnesses referred to her as Mrs. Henry and as the wife of deceased. It appears to us that the matters sought to be inquired about were collateral to the issues in the case. If the information sought to be elicited would only have the effect of showing that the witness was immoral then such questions are not proper for the purpose of discrediting the witness as to truth and veracity. In Chatham v. State, 65 Okla. Cr. 240, 84 P. 2d 804, this court held:

"The impeachment of a witness should be as to his credibility, his reputation for truth and veracity, rather than to his moral character."

In the body of the opinion the following statement is found:

"The impeachment of a witness is proper but it should be to his credibility, his reputation for truth and veracity rather than of his moral character. This is the general rule and is supported by the great weight of authority. Welch v. State, 16 Okla. Cr. 513, 185 P. 119; Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., N.S., 153; State v. Scott, 332 Mo. 255, 58 S.W. 2d 275, 90 A.L.R. 860, 70 C.J. 826; Tarling v. People, 69 Colo. 477, 194 P. 939. These cases generally refer to the evidence of the defendant himself, and it is universally held that where defendant is charged with a specific crime, such as a sale or illegal conveyance of liquor, that it is not permissible to prove the reputation of defendant as being that of a bootlegger. This is also true where one is charged with the crime of unlawful possession of intoxicating liquor. * * *

"It is also held that where a defendant goes upon the witness stand and puts his character in issue, that he may be asked on cross-examination as to specific charges against him. But in the case at bar the question of defendant's character, or that of his witness, was not put in issue. The state was permitted, over objection of defendant, to prove on re-direct examination that the reputation of the witness, Newt Hancock, was that of being the 'most notorious bootlegger in that part of McCurtain County.' It would have been perfectly admissible for the state to have proved witness' reputation for truth and veracity was bad, but not evidence of his general reputation. As was said in the case of Tarling v. People, 69 Colo. 477, 194 P. 939:

" 'While the authorities are not in entire accord upon the question, the better rule seems to be that in impeaching a witness the inquiry ought to be as to his credibility, his reputation for truth and veracity, rather than as to his moral character. The great weight of authority supports this rule. * * *

" 'This involves the necessity for sanctioning the drawing of an inference from an inference. A witness having been shown to be dishonest or immoral, it is inferred

from that trait of character that he is untruthful; then upon the inference that he is untruthful generally it may be inferred that he is untruthful in the testimony which he has given. This violates the rule that an inference shall not be based upon an inference. It follows, therefore, that the impeachment should go to his general character or reputation for veracity.' Kirk v. State, 11 Okla. Cr. 203, 145 P. 307.''

By statute it is provided that a person's interest in the case may be shown, or the fact that the witness has been convicted of crime may be shown for the purpose of affecting his credibility. 12 O.S. 1941 § 381. There is no statute and no decision, so far as we have been able to find, which holds that a person's immoral character may be shown for the purpose of affecting his or her credibility as a witness. To the contrary, there are many cases holding that a witness cannot be impeached by proof of specific acts tending to show a want of morality and that a female witness cannot be impeached by an attack upon her chastity, or by showing that she is a common prostitute. Litchfield v. State, 8 Okla. Cr. 164, 126 P. 707, 45 L.R.A., N.S., 153; Walker v. State, 8 Okla. Cr. 125, 126 P. 829; Sims v. State, 11 Okla. Cr. 382, 146 P. 914; Welch v. State, 16 Okla. Cr. 513, 185 P. 119; Wisdom v. State, 18 Okla. Cr. 118, 193 P. 1003.

Although not argued in the brief of defendant, there is one other matter that we desire to discuss. The defendant and her brother were jointly charged and were tried together. Each of them was given a sentence of life imprisonment in the penitentiary. We have carefully considered the conduct of the defendant on the day of the homicide and as has been hereinabove shown we believe the evidence was sufficient to show that she, by her words, conduct and demeanor, may have encouraged the commission of the crime. At least, the evidence was

sufficient for the submission of such issue to the jury for their determination. However, we are of the opinion, after a careful consideration of the entire record, that the evidence of defendant's guilt is not such that she should suffer a life term of imprisonment in the penitentiary, but we feel that in the interest of justice, the sentence should be modified to a term of 15 years' imprisonment in the penitentiary.

It is, therefore, ordered that the judgment and sentence of the district court of Comanche county be modified from a term of life imprisonment in the State Penitentiary to a term of 15 years in the State Penitentiary, and the judgment and sentence as thus modified is affirmed.

BRETT and POWELL, JJ., concur.